(999 P.2d 286)

No. 78,959

STATE OF KANSAS, *Appellee*, v. MICHAEL KENNETH BOWEN, *Appellant*.

Opinion filed March 3, 2000.

*M. Ruth O'Neill*, of Overland Park, for the appellant.

*Larry D. Tittel*, county attorney, and *Carla J. Stovall*, attorney general, for the appellee.

Before ELLIOTT, P.J., PIERRON and KNUDSON, J.J.

PIERRON, J.: This case is back before us after having been remanded to the trial court for consideration of certain issues. Michael Kenneth Bowen and Christine Ridpath, who resided in a house in Ness City, were wanted on arrest warrants in Ellis County. Bryan Whipple, a Ness County deputy sheriff, received a tip regarding the arrest warrants and called Ellis County authorities for more information. The arrest warrants were drug related but did not involve methamphetamine. However, a person identified as Undersheriff McIntosh informed Whipple that Bowen had a background in chemistry and had been known to manufacture methamphetamine.

Whipple had previously received a tip connecting Bowen with methamphetamine. Three months earlier, Jason Schuler, a usually reliable informant, said Bowen had offered him methamphetamine

at the Park Motel in Ness City. Bowen and Ridpath lived at the Park Motel before moving to the house.

On March 5, 1996, Whipple, accompanied by other officers, served the arrest warrants on Bowen and Ridpath at their house. Upon entering, Whipple noticed a distinct chemical odor which he identified as ether based on his prior exposure to starting fluid. When another deputy could not identify the odor, the officers moved toward the kitchen to discover its source. When Ridpath asked why the officers were snooping in her house, Whipple said they were trying to identify the chemical odor. Bowen explained the odor was produced by iodine used to treat a wound on their cat. Although Whipple did not see anything suggesting the production of methamphetamine, he later learned that iodine is used to manufacture the drug.

The Ness County Attorney, Larry D. Tittel, made an oral application for a search warrant of the house. Tittel told the magistrate the evidence would show probable cause that the manufacture and possession of methamphetamine had occurred at the "residence." Whipple's testimony provided the sole evidence in support of the warrant. Tittel asked Whipple if the offer alleged by Schuler had occurred at Bowen's "place of residence," which Whipple affirmed. Tittel added, "Now, while he has lived a couple of different places, Mr. Bowen was arrested last night at his residence, is that correct?" Whipple agreed with Tittel's statement. The State did not clarify the fact that the offer alleged by Schuler occurred somewhere other than at the residence the State wished to search.

The magistrate granted the search warrant. The search of the house, conducted with the assistance of the Kansas Bureau of Investigation (KBI), revealed bulk quantities or empty containers of ephedrine, iodine, lye, paint thinner, acetone, and muriatic acid, all raw materials for the production of methamphetamine. Red phosphorus, which can be extracted from the striker plate of matchbooks, was absent, but the authorities discovered a large number of matchbooks with the striker plates missing.

A reaction vessel was found in the kitchen, which, when tested, showed traces of ephedrine. The walls around the reaction vessel were stained in a way consistent with a long-term release of iodine

vapor. A large quantity of coffee filters in the kitchen were stained reddish brown and also bore traces of ephedrine. The State's expert stated the filters were consistent with filters used to extract methamphetamine from iodine and red phosphorus during manufacture.

The authorities also found a pipe and a set of scales, both which bore traces of methamphetamine. A diary found at the house contained the following entry dated a few weeks before the search: " 'Start batch # 33-1 oz. . . . . [p]lan 36 hr. at least.' " The State's expert said production of methamphetamine required between 24 and 48 hours for a good yield. Finally, the authorities discovered a book entitled "Secrets of Methamphetamine Manufacture."

Bowen and Ridpath were charged with the manufacture, possession, and conspiracy to manufacture methamphetamine within 1,000 feet of a school, and possession of drug paraphernalia. They were appointed separate counsel. Bowen then secured retained counsel, B.A. Lightfoot, whose fee was paid by Bowen's mother.

At some point Ridpath indicated her wish to discharge her appointed counsel and also retain Lightfoot. According to Lightfoot, he resisted Ridpath's repeated requests to represent her because of potential conflicts with Bowen's defense. Lightfoot, however, eventually agreed to represent Ridpath for no additional fee. On remand, Bowen testified he also had asked Lightfoot to represent Ridpath.

At a hearing attended by Bowen, Lightfoot, Ridpath, and Ridpath's appointed counsel, the State objected to the joint representation. The prosecutor pointed out Bowen and Ridpath would probably have adverse defenses. Lightfoot stated that the defendants realized a joint representation would limit their potential defenses. The State asked for a waiver on the record from each of the defendants of their right to appeal on the conflict issue.

In response, Lightfoot said he possessed a memorandum of understanding which each defendant had signed. While Lightfoot indicated he would not produce the memorandum because it was confidential, the document was introduced into evidence on remand. Signed by Bowen, Ridpath, and Lightfoot, the memorandum recognized that the defendants "may be precluded from as-

serting defenses which would be detrimental to one or the other of us." The memorandum authorized Lightfoot to share any information he received concerning one defendant with the other. The memorandum also stated, "[W]e understand that if and in the event that the disposition of either or both of our cases is effected [*sic*] by consent, then we will both, individually and collectively, have the right to withhold our consent to the disposition of either case or both cases." Lightfoot interpreted this last provision as allowing either defendant to prevent the other from accepting a plea offer.

While the trial court concluded all parties were on notice concerning the situation, the trial court did not question either Bowen or Ridpath about the joint representation. The trial court allowed Ridpath's appointed counsel to withdraw but expressed concern that Lightfoot was assuming Ridpath's representation only 10 days before trial. Lightfoot admitted he was feeling unprepared for trial but said he would not seek a continuance because of speedy trial concerns. Both Bowen and Ridpath, however, were in custody awaiting other criminal proceedings in Ellis County. At the hearing on remand, in order to place more pressure on the State, Lightfoot stated Bowen did not want a continuance.

At trial, the State introduced the evidence collected from the search of Bowen and Ridpath's house. According to the State's expert, the items found were sufficient to complete production of methamphetamine. Lightfoot, however, failed to renew his pretrial objection to the evidence.

The State also called Randy Smith, a special agent with the KBI. Smith testified extensively, without hearsay objection from Lightfoot, to conversations he had with Bonnie Taylor and Scott Reeves about Bowen and Ridpath.

According to Smith, Taylor and Reeves said they had purchased methamphetamine from Bowen and Ridpath. Taylor and Reeves said Bowen had learned to produce methamphetamine and that one of Bowen's methamphetamine labs had exploded at the Park Motel. They described several instances when they had taken Bowen on shopping trips for materials to be used in methamphetamine production. They also indicated Bowen and Ridpath had

provided them with the use of a car in exchange for methamphetamine. Lightfoot then cross-examined Smith and established that laboratory equipment found in Taylor and Reeves' car came from Bowen's house. The State rested without calling Taylor or Reeves as a witness.

Lightfoot did not object to the State's failure to provide Taylor and Reeves for cross-examination but instead called Taylor and Reeves as defense witnesses "because of the testimony bootlegged in by Mr. Smith." Regarding the provision of methamphetamine to Taylor by Bowen and Ridpath, Lightfoot's questioning established the rough number of transactions and the places the transactions occurred. The State was then able to lead Taylor in cross-examination, establishing the basis for Taylor's knowledge. Taylor also stated Bowen gave her a map of Hays and a list of items to purchase, including a large quantity of matchbooks, ephedrine, and iodine.

Upon direct examination of Reeves, Lightfoot confirmed the laboratory equipment in Taylor and Reeves' car came from Bowen's house. The State was again able to lead in cross-examination, establishing Bowen and Ridpath had manufactured methamphetamine near a grade school in another town as well. Reeves also testified to methamphetamine production in the Park Motel and claimed to have been present when the drug was produced in Bowen and Ridpath's house in Ness City.

Lightfoot also called Whipple as a defense witness and inquired about a receipt found in the dumpster outside Bowen and Ridpath's house. On cross-examination, the State introduced the receipt, which indicated 10 boxes of matches and iodine were purchased in Ness City 5 days before the defendants were arrested. Lightfoot then called Smith as a defense witness and used his testimony to lay the foundation for the introduction of a book found during the search of the house entitled "The Speed Culture: Amphetamine Use and Abuse in America" by the author of "Marihuana Reconsidered." Lightfoot offered the book as a defense exhibit. Through Smith, Lightfoot also established that Bowen and his landlord had the only keys to the house.

Bowen then took the stand, contrary to Lightfoot's expectation. Bowen admitted ordering the book on methamphetamine production but claimed he was attempting to make the drug for his own use. He described in detail his attempts at manufacture but contended he had never successfully produced methamphetamine. Under cross-examination he admitted to possession of drug paraphernalia and, at least to the extent of the residue on the pipe and the scales, possession of methamphetamine. He admitted to writing the diary reference to batch 33. He admitted purchasing the raw materials and constructing the reaction vessel. He claimed Ridpath was angry with him and had nothing to do with assembling the reaction vessel.

In closing arguments, Lightfoot stated, "I guess you sort of have to give Mr. Bowen credit for this, not asking this young lady to take the fall with him. . . . [H]e does have an honorable side and does have an honest side." Lightfoot argued Bowen did not conspire with Ridpath because she was angry with him and said Ridpath simply found herself living with a person whose habits she did not like. Lightfoot concluded by observing:

> "No, the only questions before you are these two individuals here. One who has made a full and honest recitation to you in the course of which has given you some pretty incriminating evidence by which you could convict him of some of the crimes which is he charged [sic]. But you must not convict Miss Ridpath, because her own crime and the only crime the State has proven, thank God, isn't a crime yet. It is called loyalty."

The jury found Bowen guilty on all counts. The trial court ordered consecutive sentences on all but the drug paraphernalia conviction.

Bowen contends the trial court erred by not investigating Lightfoot's actual conflict of interest when the matter was brought to the attention of the trial court by the State. While the Sixth amendment includes the right to select one's own counsel, the essential aim of the amendment is to guarantee an effective advocate for each criminal defendant. *Wheat v. United States*, 486 U.S. 153, 159, 100 L. Ed. 2d 140, 108 S. Ct. 1692 (1988). A trial court abuses its discretion if it fails to inquire further after becoming aware of

a potential conflict between an attorney and a client. *State v. Taylor*, 266 Kan. 967, 978, 975 P.2d 1196 (1999).

"Where the trial court is advised of the possibility of a conflict of interest involving defense counsel by either the defendant or the State, the court is required to initiate an inquiry to insure that the defendant's Sixth Amendment right to counsel is not violated. If the court fails to make such inquiry and it is latter established that an actual conflict of interest involving defense counsel and his or her client existed, reversal of the defendant's conviction on a claim of ineffective representation under the Sixth Amendment is required." *State v. Jenkins*, 257 Kan. 1074, Syl. ¶ 3, 898 P.2d 1121 (1994).

In this case, the State advised the trial court of a potential conflict of interest. Lightfoot also informed the trial court that his joint representation of Bowen and Ridpath could limit their defenses. While the State asserts the trial court placed the parties on notice of the potential conflicts, the trial court's actions did not constitute an adequate inquiry under the applicable state and federal authorities.

The trial court questioned only Lightfoot, the counsel whose joint representation was in question, and did not make an independent investigation of Bowen's understanding. In *State v. Lem'Mons*, 238 Kan. 1, 2, 705 P.2d 552 (1985), two defendants were appointed separate counsel who were partners in the same law firm. The county attorney filed a motion requesting the trial court to excuse the firm from representing one defendant because of a conflict of interest. The trial court, however, apparently did not rule on the motion.

The Kansas Supreme Court expressed concern that the trial court did not "hold an in-depth hearing on the question of conflict of interest." 238 Kan. at 9. The court stated that the demonstrated competence of the defense counsel and the overwhelming evidence of guilt would not alter the analysis. 238 Kan. at 9. The court reversed, holding courts have an obligation to protect those charged with a criminal offense and to insure they receive a fair trial. 238 Kan. at 9-10.

An in-depth hearing or inquiry should result in one of three outcomes: (1) a determination that the risk of conflict is too remote to warrant separate counsel; (2) the appointment of separate coun-

sel; or (3) a determination that defendants waive the right to con-flict-free representation. *U.S. v. Gallegos,* 108 F.3d 1272, 1282 (10th Cir. 1997) (citing *Holloway, v. Arkansas,* 435 U.S. 475, 483 n.5., 55 L. Ed. 2d 426, 98 S. Ct. 1173 [1978]). Here, the trial court did not determine the risk of conflict was remote, and it allowed Lightfoot to assume joint representation without determining if Bowen waived his rights. Following *Jenkins,* the conviction must be reversed if Bowen did not waive his right to conflict-free rep-resentation and if Bowen now shows that Lightfoot operated under an actual conflict.

A defendant may waive his or her right to conflict-free counsel. See *Holloway,* 435 U.S. at 483 n.5; *Wallace v. Ward,* 191 F.3d 1235, 1245 (10th Cir. 1999). Any waiver must be knowing, volun-tary, and done with an awareness of relevant circumstances and likely consequences. 191 F.3d at 1245. The principle is unchanged where a defendant retains his or her own counsel. *Cuyler v. Sul-livan,* 446 U.S. 335, 344, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980); *Stouffer v. Reynolds,* 168 F.3d 1155, 1161 (10th Cir. 1999).

While research reveals no Kansas decisions setting out the proper procedure for a waiver, federal authorities require the trial court to " 'affirmatively participate in the waiver decision by elic-iting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has know-ingly and intelligently made the decision to proceed with the chal-lenged counsel.' " *U.S. v. Migliaccio,* 34 F.3d 1517, 1527 (10th Cir. 1994) (quoting *United States v. Winkel,* 722 F.2d 605, 611 [10th Cir. 1983]). Whatever form the trial court's actions take, the court must "indulge every reasonable presumption against the waiver of fundamental rights." *Glasser v. U.S.,* 315 U.S. 60, 70, 86 L. Ed. 680, 62 S. Ct. 457 (1942); *Stouffer,* 168 F.3d at 1162.

While the *Migliaccio* opinion places the narrative response re-quirement in proximity to a rule of federal criminal procedure, the authority cited by the opinion appears to base the requirement on constitutional grounds. See 34 F.3d at 1527; *United States v. Mar-tinez,* 630 F.2d 361, 364 (5th Cir. 1980), *cert. denied* 450 U.S. 922 (1981).

The trial court's actions in the present case were insufficient. Mere assurances from a defense counsel, whose representation is in question, cannot provide the basis for finding a waiver of such a fundamental right. The trial court also did not examine the memorandum of understanding. The fact Lightfoot was unwilling to divulge the memorandum establishing his joint representation should have heightened concern over the sufficiency of the waiver.

Even if the trial court had examined the memorandum, it would not have been sufficient to establish waiver. The memorandum did not establish the extent of Lightfoot's consultation with Bowen. According to the United States Supreme Court, it is not "amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them." *Wheat*, 486 U.S. at 163. The memorandum also did not spell out the possible consequences if certain defenses were precluded.

The State complains Bowen stood silent at each stage of the proceeding. But once the trial court was advised of the potential conflict it was obliged to make an inquiry sufficient to "insure that the defendant's Sixth Amendment right to counsel [was] not violated," *Jenkins*, 257 Kan. 1074, Syl. ¶ 3. Moreover, when the State objected to the conflict, Lightfoot offered to consider an acknowledgement regarding the defendant's rights if the State would prepare it. Nothing in the record indicates the State took this step.

The final question is the existence of actual conflict. Actual conflict arises if the codefendants' interests diverge as to a material factual or legal issue or regarding a course of action. *Cuyler*, 446 U.S. at 356 n.3; *Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996). The memorandum of understanding not only recognized the potential for conflict, it created actual conflict by purporting to give each defendant a veto over a course of action, a plea agreement, contemplated by the other.

Included as it is in a memorandum dealing with Lightfoot's joint representation, presumably prepared by him and certainly signed by him, this power over the other defendant was unavoidably tied up with Lightfoot's authority as counsel. Bowen need not show prejudice because the evil here is what an advocate *refrains* from

doing, "not only at trial but also as to possible pretrial plea negotiations. . . ." *Holloway*, 435 U.S. at 490. Where timely objection is made to joint representation of conflicting interests, and the trial court fails to adequately address the conflicting interests, reversal is automatic. 435 U.S. at 489; *Gallegos*, 108 F.3d at 1280.

Bowen contends Lightfoot's arguments in closing demonstrated actual conflict. The impact of Bowen's contention is certainly weakened by the fact he admitted on the witness stand to most of the State's allegations. If he had a plan in mind while testifying, it presumably was to absolve Ridpath of guilt, which was the argument advanced by Lightfoot.

An assessment of the impact of the conflict on Lightfoot's tactics and decisions, however, would require unguided speculation. See *Holloway*, 435 U.S. at 491. Bowen must only show actual conflict. Where an attorney owed a duty to two defendants, yet argued one defendant's testimony incriminated him and cleared the other defendant, one may reasonably conclude the attorney labored under an actual conflict.

While the crimes charged were grave and the resources expended were significant, courts must assiduously protect Sixth Amendment rights. The trial court expressed concern over the possibility of conflict but did not make an inquiry sufficient to insure a fair trial. The conviction must be reversed and the case remanded for a new trial.

We need not deal with many of Bowen's complaints of ineffective assistance of counsel as he is receiving a new trial. However, we will address the specific legal issues that might arise again.

Concerning the motion to suppress, we do note that the testimony presented to the magistrate was somewhat fuzzy as to which residence was the location of the offer by Bowen to Schuler of methamphetamine.

While generally a defendant may not dispute allegations supporting a search warrant, a hearing under *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), is required if a defendant makes a showing supported by sworn allegation that the application for search warrant contained material statements of deliberate falsehood or of reckless regard for the truth which were

necessary to the finding of probable cause. *State v. Jensen*, 259 Kan. 781, 787, 789, 915 P.2d 109, *cert. denied* 519 U.S. 948 (1996). The same rule applies to a deliberate omission of material information. *State v. Lockett*, 232 Kan. 317, 319, 654 P.2d 433 (1982).

While Bowen never specifically asked for a *Franks* hearing, the motion to suppress was, in effect, a *Franks* hearing. A *Franks* hearing is simply an evidentiary hearing on a motion to suppress evidence based on a challenge to the facts included or omitted from a search warrant. See *State v. Jacques*, 225 Kan. 38, 44, 587 P.2d 861 (1978). There is no particular remedy if the defendant proves the need for a hearing. After the hearing, the trial court still must decide if the facts showed probable cause to issue the warrant. See 225 Kan. at 44.

After a review of the facts, we find no deliberate misleading of the magistrate. While the factual statements could have been clearer, they were literally true. We believe the previous offer by Bowen to Schuler of methamphetamine, plus the chemical smell in the house, could reasonably supply the necessary basis for the issuance of a search warrant. If the basis was arguably a little thin, it was certainly close enough to be saved by the good faith exception of *United State v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984).

Bowen requested that the jury be instructed on the word "manufacture" as the word is defined in K.S.A. 1998 Supp. 65-4101(n), which excludes from manufacture the "preparation or compounding of a controlled substance" for one's own use.

This provision appears to apply to legitimate commercial and research situations. The statute under which Bowen was charged, K.S.A. 1998 Supp. 65-4159(a), refers to the unlawful manufacture of the drug, not those situations involved in 65-4101(n). K.S.A. 1998 Supp. 65-4159(a) does not contain such an exception and does not refer to 65-4101. We believe the trial court was correct in its denial of the requested instruction.

Bowen renews his arguments concerning alleged prosecutorial misconduct. Lightfoot claimed below that Tittel had stolen his tapes. On appeal, in addition to this point, Bowen also alleges the State withheld exculpatory evidence. He does not explain what

evidence was withheld, and a point raised incidentally but not argued is deemed abandoned. *McKissick v. Frye*, 255 Kan. 566, 578, 876 P.2d 1371(1994).

The tapes were recordings that Smith had made of his interviews with Taylor and Reeves. They contained information regarding unrelated, confidential, and ongoing investigations by the KBI. Tittel, however, gave the tape to Lightfoot before he knew the other information was on the tape.

Apparently, Tittel then took the tapes from Lightfoot, edited the other portions out, and returned the tapes. The trial court listened to the tapes in camera to verify that the edited portions did not relate to Bowen and Ridpath's case. The court offered Lightfoot an opportunity to review the tapes, but Lightfoot refused because he was unwilling to keep the information confidential from his clients. The court denied the motion to dismiss for prosecutorial misconduct.

Bowen does not show Tittel's actions amounted to theft. Judging from the record on appeal, Tittel's actions were not gross and flagrant and did not show ill will. In addition, Bowen does not explain how he was harmed by the State's behavior. *Cf. State v. Follin*, 263 Kan. 28, 45, 947 P.2d 8 (1997). The trial court did not err in refusing to dismiss the case.

Bowen also claims, as a matter of law, that there was insufficient evidence to find him guilty beyond a reasonable doubt. There obviously was sufficient evidence.

As noted above, all other matters raised Bowen are matters of trial preparation and tactics which are now academic, as there will be a new trial.

Reversed and remanded for a new trial.