No.112,575

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DESHAWN JACKSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court reviews the trial court's denial of a postsentencing motion to withdraw plea for an abuse of discretion.

2.

An abuse of discretion occurs when a judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.

3.

In reviewing the trial court's denial of a motion to withdraw plea, an appellate court will defer to the trial court's factual findings so long as those findings are supported by substantial competent evidence.

4.

A defendant has the burden of proving that the trial court abused its discretion.

5.

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel. This right, made applicable to the states through the Fourteenth Amendment to the United States Constitution, requires more than the presence of an attorney; it guarantees the right to effective assistance from the attorney.

6.

A counsel owes the client a duty of loyalty and a duty to avoid conflicts of interest.

7.

A defense attorney has the obligation, upon discovering a conflict of interest, to advise the court at once of the problem.

8.

When a defense attorney is representing two defendants in a criminal matter, the defense attorney is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of trial.

9.

When a trial court is notified of a potential conflict of interest faced by a criminal defense attorney, the court is required to make an appropriate in-depth inquiry into the conflict. If an appropriate inquiry is made, the trial court's decision to deny a motion to withdraw is reviewed under the abuse of discretion standard.

10.

When a defendant alleges that an attorney's multiple representations created a conflict of interest resulting in ineffective assistance of counsel and there was no objection, that defendant must prove (1) that he or she had an actual conflict of interest with counsel, and (2) that this conflict of interest adversely affected the adequacy of his or her attorney's representation.

11.

If a defendant can prove that a conflict affected the adequacy of his or her attorney's representation, then the defendant need not demonstrate prejudice in the traditional sense, which requires the defendant to prove that counsel's deficient performance affected the outcome of the trial, due to the difficulty of establishing such a claim in cases based on conflicting loyalties.

12.

Attorneys owe ethical obligations to both former and current clients and an obligation to avoid representing clients where there is a conflict of interest with either former or current clients.

13.

To waive the right to conflict-free counsel, a defendant's waiver must be knowing, voluntary, and done with an awareness of relevant circumstances and likely consequences.

14.

A negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.

3

15.

A defendant is entitled to a conflict-free defense attorney during the plea-bargain process.

Appeal from Seward District Court; CLINT PETERSON, judge. Opinion filed November 25, 2015. Reversed and remanded with directions.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Russell W. Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., HILL, J., and TIMOTHY G. LAHEY, District Judge, assigned.

GREEN, J.:  Deshawn Jackson appeals the trial court's denial of his postsentencing motion to withdraw plea. On appeal, Jackson argues that there are two reasons the trial court erred when it denied his motion. First, Jackson argues that he has established that his attorney, Aaron Gipson, coerced him into accepting the plea agreement by telling him that if he rejected the plea agreement he would receive the maximum possible sentence. Second, Jackson argues that Gipson provided ineffective assistance of counsel due to a conflict of interest that adversely affected his representation. Although Jackson's argument regarding coercion fails, Jackson successfully shows that Gipson had a conflict of interest that adversely affected his representation. Thus, the trial court erred when it denied Jackson's motion to withdraw plea. Consequently, we reverse Jackson's conviction and remand to the trial court with directions to grant his motion to withdraw plea.

Jackson was convicted of aggravated battery in Seward County case number 10CR545. Jackson's codefendant in this case was Francisco Beltran. Although it is unclear exactly with what the State charged Beltran, the Seward County case number associated with Beltran's case is 10CR546. Attorney Aaron Gipson represented Beltran in

10CR546. Ultimately, both Jackson and Beltran received probation for their convictions in 10CR545 and 10CR546 respectively.

On November 26, 2011, while Jackson was on probation for 10CR545, Jackson and his girlfriend, Alexandra Duran, got into an argument at their home. During the first part of the argument, Jackson grabbed Duran by the neck and told her that he would hurt her if she did not give him gas money. Later, Jackson told Duran to lie on her stomach with her hands behind her back on the bed. As Duran lay on the bed, Jackson bound Duran's hands together with shoelaces and placed tape over her mouth. Then, Jackson forced Duran into a bathtub filled with running water. Jackson attempted to force Duran's head under the water several times before the tape fell off and she was able to get one of her bound hands loose.

After Duran got free, Jackson took Duran to his sister's house. Jackson's sister, Lani Jackson, and Lani's boyfriend were inside the house. Duran, who still had a shoelace bound around one of her wrists, saw both Lani and Lani's boyfriend as Jackson forced her into the house. Lani and her boyfriend were sitting together on a bed when Duran overheard Jackson tell Lani that he was tired of Duran and that he was going to take her out and kill her. Although Duran later testified at the preliminary hearing that she did not know the identity of Lani's boyfriend, Jackson's presentence investigation report identified the man sitting on the bed with Lani as Francisco Beltran.

Eventually, Jackson, Duran, and Lani went to a gas station. Jackson told Duran to go into the gas station and buy some juice. Once Duran went inside the gas station, she called the police.

The police arrested Jackson and brought Duran to the police station for an interview. During the interview, the investigating police officer observed that Duran had

5

red welts and slightly broken skin around both of her wrists. The investigating police officer also observed that the bottom of Duran's shirt was wet.

On November 30, 2011, in Seward County case number 11CR411, the State charged Jackson with the following: one count of attempted first-degree murder, a severity level 1 person felony, in violation of K.S.A. 2011 Supp. 21-5402(a)(1); one count of aggravated kidnapping, a severity level 1 person felony, in violation of K.S.A. 2011 Supp. 21-5408(b); one count of aggravated robbery, a severity level 3 person felony, in violation of K.S.A. 2011 Supp. 21-5420(b); and one count of aggravated battery, a severity level 7 person felony, in violation of K.S.A. 2011 Supp. 21-5413(b)(1)(B). Furthermore, because of the 11CR411 charges, the State moved to revoke Jackson's probation in 10CR545.

On December 1, 2011, the trial court appointed Gipson to represent Jackson in 11CR411. Gipson was also appointed to represent Jackson on his probation revocation in 10CR545. Beltran, Gipson's former client in 10CR546, had been subpoenaed as a State's witness against Jackson in 11CR411.

Furthermore, Gipson was also reappointed to represent Beltran. It seems that the State had moved to revoke Beltran's probation in 10CR546. It is unclear from the record why the State moved to revoke Beltran's probation. It is also unclear from the record the exact date Gipson was reappointed to represent Beltran on the probation revocation in 10CR546. At Jackson's motion to withdraw plea hearing, however, Gipson testified that Beltran's probation was revoked on January 20, 2012. Thus, for a time, Gipson was concurrently representing both Jackson and Beltran.

On December 28, 2011, the trial court held a preliminary hearing in 11CR411. Beltran did not testify at the preliminary hearing. Then, on March 5, 2012, Jackson entered into a plea agreement with the State.

6

Under the plea agreement, the State amended the charges against Jackson. The State amended the one count of first-degree attempted murder to one count of second-degree attempted murder, a severity level 4 person felony, in violation of K.S.A. 2011 Supp. 21-5403 and K.S.A. 2011 Supp. 21-5301. Furthermore, the State dismissed the remaining charges against Jackson. The State also agreed to recommend that the trial court impose the standard sentence for the attempted second-degree murder count so long as Jackson stipulated his sentence in 11CR411 would be consecutive to his underlying sentence in 10CR545; it seems Jackson's probation in 10CR545 had been revoked.

In accordance with this agreement, Jackson pled no contest to one count of attempted second-degree murder. During the plea colloquy, Jackson stated that no one had threatened him into accepting the plea agreement. Additionally, Jackson stated that he was satisfied with Gipson's representation. The trial court ultimately accepted Jackson's no contest plea. In 11CR411, the trial court sentenced Jackson to 71 months' imprisonment followed by 24 months' postrelease supervision. The trial court ordered that Jackson's sentence in 11CR411 run consecutive to Jackson's sentence in 10CR545. The journal entry of judgment in 11CR411 indicates that Jackson's sentence in 10CR545 was 16 months' imprisonment.

In March 2013, Jackson moved to withdraw his no contest plea in 11CR411. In his pro se motion, Jackson alleged that Gipson threatened him into accepting the plea agreement, telling him that he would receive the maximum sentence if he went to trial. Jackson also alleged that Gipson's dual representation of both him and Beltran was a conflict of interest that resulted in ineffective assistance of counsel.

The trial court appointed counsel to represent Jackson on his motion to withdraw plea. A hearing on this motion was held in April 2014. The only evidence presented at this hearing was the testimony of Jackson and Gipson. Jackson testified that Gipson had threatened him into accepting the plea by telling him that he would receive the maximum

7

sentence for all of his charges if he went to trial. Moreover, Jackson testified that he believed that Gipson's dual representation of him and Beltran was a conflict of interest that limited Gipson's representation. Jackson further testified that Gipson hid the fact that he had a conflict of interest. Jackson asserted that Gipson never told him that he was also representing Beltran, and he only learned that Gipson was representing Beltran following his conviction.

Gipson testified that he never threatened Jackson. Gipson testified that he simply told Jackson that the prosecutor had told him he would be pursuing the maximum sentence for each charge against Jackson if Jackson did not accept the plea. Gipson also testified that he told Jackson that he was also representing Beltran. Gipson testified that Jackson told him that he was "okay" with this because Beltran "wasn't really a witness to anything." Furthermore, without prompting, Gipson brought up the fact that he never obtained a signed written waiver from Jackson. At the hearing, Jackson's attorney asked Gipson the following, "And the issue that we have in this case is that at no point was it waived that there was a conflict between the representation of those number of people; is that right?" Gipson responded, "No, that's not right. It wasn't written. I never had him sign it. But in speaking to him, he waived it, not on the record, but with me, yes."

The trial court denied Jackson's motion to withdraw plea. Regarding Jackson's allegation that Gipson had threatened him to accept the plea, the trial court found that Gipson's testimony was more credible. Regarding Jackson's allegation that Gipson had a conflict of interest resulting in ineffective assistance of counsel, the trial judge stated that Gipson's concurrent representation of Jackson and Beltran was troubling. Nevertheless, the trial judge found that even though there was a conflict and Gipson should have obtained Jackson's waiver of the conflict in writing, he believed that Gipson told Jackson that he was also representing Beltran. Thus, the trial court found that Jackson had not established manifest injustice to withdraw his plea because Jackson was aware of the conflict and had received the benefit of his plea bargain.

8

*Did the Trial Court Err When It Denied Jackson's Motion to Withdraw Plea?*

On appeal, Jackson asserts that the trial court erred when it denied his motion to withdraw plea for two reasons. First, Jackson argues that he was coerced into accepting the plea agreement because Gipson told him he would receive the maximum possible prison sentence if he rejected the plea agreement. Second, Jackson argues that Gipson provided ineffective assistance of counsel because he had a conflict of interest which adversely affected his representation. As discussed below, Jackson fails to establish that Gipson coerced him into accepting the plea agreement. Nevertheless, Jackson successfully establishes that he had a conflict of interest with Gipson and that this conflict of interest adversely affected Gipson's representation. Thus, the trial court erred when it denied Jackson's motion to withdraw plea. As a result, this court reverses Jackson's conviction and remands the case to the trial court with directions to grant Jackson's motion to withdraw plea.

*Standard of Review*

K.S.A. 2014 Supp. 22-3210(d)(2) states: "To correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea." Manifest injustice exists if something is "obviously unfair or shocking to the conscience." *State v. Barahona*, 35 Kan. App. 2d 605, 608-09, 132 P. 3d 959 (2006). In determining whether the defendant has established manifest injustice, this court should consider the following factors: "(1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made." *State v. Bricker*, 292 Kan. 239, 244, 252 P.3d 118 (2011).

An appellate court reviews a trial court's denial of a postsentencing motion to withdraw plea for an abuse of discretion. *Bricker*, 292 Kan. at 244. An abuse of discretion occurs when a judicial action

> "(1) is arbitrary, fanciful, or unreasonable, *i.e.,* if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.,* if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.,* if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Macias-Medina*, 293 Kan. 833, 836, 268 P.3d 1201 (quoting *State v. Ward*, 292 Kan. 541. Syl. ¶ 3, 256 P.3d 801 [2011]).

In reviewing the trial court's denial of a motion to withdraw plea, this court will defer to the trial court's factual findings so long as those findings are supported by substantial competent evidence. *State v. Anderson*, 291 Kan. 849, 855, 249 P.3d 425 (2011). Moreover, the defendant has the burden of proving that the trial court abused its discretion. *Bricker*, 292 Kan. at 244.

*Coercion Argument*

Jackson argues that Gipson coerced him into accepting the plea agreement by telling him that he would receive the maximum prison sentence for each count the State had charged him with in 11CR411 if he did not accept the plea agreement. Thus, Jackson contends that this court must let him withdraw his plea.

Nevertheless, Gipson's testimony contradicts Jackson's argument. At Jackson's motion hearing, Gipson testified that he never coerced Jackson into accepting the plea agreement. Instead, Gipson testified that he let Jackson know that the prosecutor had told him that he would be asking for the maximum sentence upon Jackson's conviction if Jackson rejected the plea agreement and went to trial. In denying Jackson's motion to

10

withdraw plea, the trial judge found that Gipson had not threatened or coerced Jackson into accepting the pleas by telling him he would receive the maximum sentence. The trial court further found that Gipson was simply letting Jackson know what the prosecutor had told him. Thus, the trial court made a determination that Gipson's testimony was more credible than Jackson's testimony.

As previously stated, this court does not "reweigh evidence or assess witness credibility," giving deference to the trial court's factual findings so long as those findings are supported by substantial competent evidence. *Anderson*, 291 Kan. at 855. Here, Gipson's testimony supported the trial court's finding. Given that the trial court made a credibility determination which was supported by substantial competent evidence, this court must defer to the trial court's finding on this issue. Consequently, Jackson's argument that the trial court erred in denying his motion to withdraw plea because he was coerced into accepting the plea fails.

*Conflict of Interest Argument*

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel. "This right, made applicable to the states through the Fourteenth Amendment to the United States Constitution, requires more than the presence of an attorney; it guarantees the right to effective assistance from the attorney." *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012) (citing *Strickland v. Washington,* 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). In accordance with this right, "'counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest.'" *Galaviz*, 296 Kan. at 174 (quoting *Strickland,* 466 U.S. at 688).

In *Mickens v. Taylor,* 535 U.S. 162, 168-69, 122 S. Ct. 1237, 152 L. Ed. 2d 291, *reh. denied* 535 U.S. 1074 (2002), the United States Supreme Court held that when an attorney actively represents conflicting interests and there is no objection to such

11

representation, a defendant alleging ineffective assistance of counsel based on this conflict must prove that the conflict actually adversely affected his or her attorney's representation. See also *Galaviz*, 296 Kan. at 183-84. Thus, when a defendant alleges that an attorney's multiple representations created a conflict of interest resulting in ineffective assistance of counsel and there was no objection, that defendant must prove: (1) he or she had an actual conflict of interest with counsel, and (2) this conflict of interest adversely affected the adequacy of his or her attorney's representation. If a defendant can prove that a conflict affected the adequacy of his or her attorney's representation, then the defendant "'need not demonstrate prejudice in the traditional sense, which requires the defendant to prove that counsel's deficient performance affected the outcome of the trial, due to the difficulty of establishing such a claim in cases based on conflicting loyalties.'" *State v. Stovall*, 298 Kan. 362, 375, 312 P.3d 1271 (2013) (quoting *Boldridge v. State*, 289 Kan. 618, 622-23, 215 P.3d 585 [2009]).

On appeal, Jackson argues that his right to an effective, conflict-free, attorney was violated. Jackson contends that Gipson's representation of him and Beltran constituted a conflict of interest. Moreover, Jackson contends that this conflict adversely affected Gipson's representation of him in three ways: (1) the conflict resulted in Gipson threatening him that he would receive the maximum sentence if he did not accept the plea agreement; (2) the conflict resulted in Gipson violating the Kansas Rules of Professional Conduct (KRPC); and (3) the conflict impacted Gipson's mindset while negotiating the plea and explaining the plea, resulting in Gipson encouraging him to take the plea deal to avoid any further conflict.

*Did a Conflict of Interest Exist?*

"[A]ttorneys owe ethical obligations to both former and current clients and an obligation to avoid representing clients where there is a conflict of interest with either former or current clients." *Galaviz*, 296 Kan. at 178-79. In Kansas, the KRPC governs

whether a concurrent conflict of interest exists. Under KRPC 1.7 (2014 Kan. Ct. R. Annot. 531) (conflict of interest), a concurrent conflict of interest exists when

> "(1) the representation of one client will be directly adverse to another client; or (2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."

Here, Gipson had represented Beltran in 10CR546, a case in which Beltran and Jackson were codefendants. Thus, when Gipson was appointed to represent Jackson on his charges in 11CR411, he had an ongoing obligation to Beltran as a former client. Beltran, however, was a State's witness against Jackson in 11CR411. Therefore, Jackson and Beltran had conflicting interests.

Furthermore, at some point during Gipson's representation of Jackson in 11CR411, the State moved to revoke Beltran's probation in 10CR546. Gipson was reappointed to represent Beltran on the probation revocation in 10CR546. This means that during Gipson's representation of Jackson in 11CR411, Gipson was additionally representing Beltran on his probation revocation in 10CR546. Thus, for a time, Gipson had concurrent clients with conflicting interests.

The facts of this case are very similar to the facts of *State v. Jenkins*, 257 Kan. 1074, 1080, 898 P.2d 1121 (1995) (overruled on other grounds by *Galaviz*, 296 Kan. 168, Syl. ¶ 7). In *Jenkins*, Jenkins' attorney had previously represented the State's key witness in Jenkins' case on multiple occasions. Moreover, during Jenkins' case, the attorney was reappointed to represent the State's key witness on an unrelated charge. Given those circumstances, the *Jenkins* court held that there was clearly a conflict of interest because the attorney had to attack the credibility of the State's key witness, who was her client in another case, to advocate for Jenkins. 257 Kan. at 1080.

13

As in *Jenkins*, a conflict of interest clearly exists in this case. Gipson had a duty to advocate zealously for Jackson in 11CR411. Nevertheless, Gipson also had a duty to protect the interests of Beltran, who was the State's witness against Jackson and who was facing the possibility of probation revocation.

The dissent states that Beltran was not a key witness as to any of the alleged crimes committed in this case, asserting that the comparison of the facts of Jackson's case to *Jenkins* is misplaced. For example, the dissent says that "[t]he record is devoid of any factual suggestion or circumstance that would indicate Beltran had any material information about the crime-he was not a witness to any material element of the crime." The record does not support the dissent's assertion. Moreover, the trial court never made such a finding when it denied Jackson's motion to withdraw.

The dissent seems to ignore the fact that Jackson was charged not only with attempted first-degree murder but also with aggravated kidnapping, aggravated robbery, and aggravated battery. The reasoning of the dissent can be reconstructed into the following syllogism:

Major premise: Only witnesses who are present when a crime is committed will have material information about the crime.

Minor premise: Beltran was not present when the initial crimes occurred.

Conclusion: Therefore, Beltran will not have any material information about these crimes.

This is a logical non sequitur to conclude from the major premise that because Beltran was not present when the alleged crimes occurred that he would have no material information about any of these crimes. As the dissent points out, Beltran was at Lani's

14

house when Jackson allegedly forced Duran, the alleged victim, who still had a shoelace bound around one wrist and visible red welts around the other wrist, into the house. While inside Lani's house, Duran allegedly heard Jackson tell Lani that he was tired of Duran and that he was going to take her out and kill her. Because Beltran and Lani were sitting next to each other on the bed when Duran overheard Jackson make this statement to Lani, it is very likely that Beltran would have overheard this same statement. Moreover, it is very likely that Beltran would have seen Duran with one wrist bound with a shoelace and with visible red welts around her other wrist. Thus, the State would have certainly wanted to call Beltran as a corroborating witness for some of the charges filed against Jackson.

On the face of it, the fact that Beltran was not present when Jackson allegedly tried to kill Duran does not mean that Beltran would be incapable of having any material information about one or more of these crimes. Thus, the dissent's reasoning is flawed.

If Jackson had gone to trial, the State would have called Beltran as a corroborating witness. Consequently, as in *Jenkins*, a conflict of interest clearly existed because Gipson was not only representing Jackson in 11CR411 but was also representing Beltran on his probation revocation in 10CR546, a case in which Jackson and Beltran were codefendants. As a result, Jackson has established an actual conflict of interest existed with Gipson's representation of him in 11CR411.

*Did Jackson Waive the Conflict of Interest?*

In denying Jackson's motion, the trial judge stated that he believed Gipson when Gipson testified that he told Jackson that he was also representing Beltran. Although the trial judge did not specifically find that Jackson had orally waived his right to a conflict-free attorney, as Gipson had testified, it seems that the trial judge made a credibility determination that Gipson was telling the truth about the discussion in which he alleges

15

that Jackson waived his right to a conflict-free attorney. Regardless of the trial court's findings, the record does not support that Jackson made an adequate waiver of his right to conflict-free counsel.

In *Boldridge v. State*, 289 Kan. at 626, our Supreme Court noted that under the KRPC the right to conflict-free counsel may be waived only if each affected client gives informed consent which is confirmed in writing. See KRPC 1.7(b)(4) (2014 Kan. Ct. R. Annot. 531). Although the *Boldridge* court recognized that there are some instances where statements made on the record can be substituted for informed consent in writing, the *Boldridge* court emphasized that "an oral statement by a defendant accepting counsel's appointment, without more, does not satisfy the waiver requirements." 289 Kan. at 626. Moreover, in *State v. Bowen*, 27 Kan. App. 2d 122, 129, 999 P.2d 286 (2000), this court held that to waive the right to conflict-free counsel, a defendant's "waiver must be knowing, voluntary, and done with an awareness of relevant circumstances and likely consequences."

In this case, there was no waiver of the right to conflict-free counsel in writing. Instead, the only evidence supporting that Jackson waived the conflict was Gipson's testimony at the motion hearing that Jackson orally waived the conflict. According to Gipson, that oral waiver occurred after he and Jackson discussed the fact that he had also been appointed to represent Beltran.

Given those facts, Jackson could not have waived his right to conflict-free counsel. First, Jackson could not have waived his right to conflict-free counsel because he never made an informed waiver in writing. It is uncontested that *if* Jackson waived his right to a conflict-free attorney, he did so orally. This alleged waiver is also problematic because at the motion to withdraw plea hearing, without prompting, Gibson acknowledged he never obtained a signed written waiver of the conflict from Jackson. This indicates Gibson knew he was supposed to obtain a written waiver, not an oral waiver, but failed to do so.

16

Our Supreme Court has held that an oral statement by a defendant, without further support, cannot constitute a valid waiver of that defendant's right to a conflict-free attorney; therefore, Jackson did not waive his right to a conflict-free attorney. See *Boldridge* 289 Kan. at 626.

Second, Jackson could not have waived his right to a conflict-free attorney because Gipson's testimony clearly shows that Jackson's waiver was not made knowingly or made with an awareness of the relevant circumstances or likely consequences. Again, Gipson never testified that he and Jackson discussed the potential problems which could arise from him concurrently representing Beltran. Gipson never testified that he explained to Jackson that he had an ethical duty to both Beltran and Jackson. For example, the record lacked any discussion between Gipson and Jackson on whether he could continue to represent Jackson if Jackson refused to accept a plea deal with the State. Moreover, the record contains no discussion between Gipson and Jackson on whether this conflict would diminish Gipson's usefulness to Jackson. In other words, would Gipson's representation of Jackson be as effective as it might have been if the conflict did not exist?

Gipson simply testified that Jackson orally waived his right to a conflict-free attorney after he told Jackson that he was also representing Beltran.

Because Jackson's waiver was not made knowingly or made with an awareness of the relevant circumstances or likely consequences, Jackson did not waive his right to a conflict-free attorney. At the very least, Gipson's testimony provided too little information for the trial court to have found or for this court to find that Jackson made a knowing waiver of his right to conflict-free counsel.

Third, nothing in the record on appeal indicates that Gipson ever attempted to obtain a waiver of conflict from Beltran. Under KRPC 1.7(b)(4), the right to conflict-free

17

counsel may be waived only if each affected client gives informed consent which is confirmed in writing. Although the KRPC does not provide substantive or procedural law in criminal proceedings (see *State v. Stovall*, 298 Kan. 362, 372, 312 P.3d 1271 [2013]), it seems unworkable for this court to find that Jackson made a valid waiver of the conflict given that there is no evidence that Gipson ever even discussed that a conflict of interest existed with Beltran.

Nevertheless, the dissent argues that because the trial court made a credibility determination that it believed Gipson, Jackson should not be allowed to withdraw his plea because he knew about the conflict all along yet voluntarily entered a favorable plea. The dissent seems to forget that even if Jackson knew about the conflict all along, this does not mean that Jackson made a valid waiver of the conflict. In Jackson's case, at best, there was an oral waiver to the conflict without any discussion of the relevant circumstances or likely consequences of the waiver. As previously detailed, such an oral waiver is invalid both under *Boldridge* and *Bowen*. Thus, even if Jackson was aware that Gipson was representing Beltran in another case, Jackson did not make a valid waiver of the conflict of interest.

*Did the Conflict of Interest Adversely Affect the Adequacy of Gipson's Representation?*

In his brief, Jackson argues that the conflict of interest adversely affected the adequacy of Gipson's representation in three ways. First, Jackson argues that the conflict resulted in Gipson threatening him by telling him that he would receive the maximum sentence if he did not accept the plea agreement. Second, Jackson argues that the conflict resulted in Gipson violating the KRPC. Third, Jackson argues that the conflict impacted Gipson's mindset while negotiating the plea and explaining the plea to him.

First, in making the argument that the conflict resulted in Gipson threatening him to take the plea agreement, Jackson essentially repeats his argument that Gipson coerced

18

him into accepting the plea agreement. In essence, Jackson argues that the conflict of representing both him and Beltran resulted in Gipson threatening him into accepting the plea agreement or else he would receive the maximum possible prison sentence. As previously discussed, however, the trial court determined that Gipson's testimony was more credible than Jackson's testimony regarding the alleged threat. Because the trial court made a credibility determination and Gipson's testimony supports this determination, this court must defer to the trial court's finding that Jackson was not coerced into accepting the plea agreement by the threat of receiving the maximum possible punishment if he went to trial. Thus, Jackson's argument that the conflict resulted in Gipson threatening him into accepting the plea agreement fails.

Second, Jackson's argument that the conflict resulted in Gipson violating the KRPC fails because Jackson never explained how the conflict of interest resulted in Gipson's failure to follow KRPC procedures. In making this argument, Jackson details how Gipson violated KRPC 1.7. Then, Jackson states: "Gipson's failure to follow the procedure for a client waiver of a conflict indicates that the conflict substantially affected his performance." Jackson begs the question with this assertion; however, he never explains how Gipson's conflicting ethical duties between him and Beltran substantially affected Gipson's performance. Instead, Jackson asks this court to assume that it was the conflict that resulted in Gipson's failure to comply with the KRPC. Nevertheless, without more, there is not enough evidence to support this conclusion. Therefore, Jackson's second argument why the conflict adversely affected Gipson's representation fails.

Unlike his first two arguments, Jackson's third argument has merit. In his third argument, Jackson contends that the conflict adversely affected Gipson's mindset while negotiating the plea and explaining the plea to him. Jackson argues that Gipson had to encourage him to accept the plea deal or else Gipson would "be placed in a position of a continued conflict of interest with [him] and [with Beltran]."

19

Jackson's argument points out an unavoidable truth. If Jackson did not accept the plea deal, the conflict between Gipson, Jackson, and Beltran would become readily apparent when Beltran testified at trial. Once Gipson had reached the trial phase of Jackson's case, the court and Gipson's clients would have learned of his failure to follow proper procedure regarding conflicts of interests under the KRPC. Moreover, the trial court would have been put on notice that this conflict would have diminished Gipson's effectiveness to Jackson, Beltran, or both.

Furthermore, it is very likely that Gipson would have been forced to withdraw as counsel for both Jackson and Beltran. How could Gipson continue to zealously advocate for Jackson if he had to cross-examine Beltran? How could Gipson ethically undermine Beltran's testimony and attack Beltran's credibility at Jackson's trial when Beltran was facing probation revocation? What if Gipson learned information from Beltran that would help him remain on probation but hurt Jackson at trial? What if Gipson learned information from Jackson that would help him win at trial but hurt Beltran's chances of remaining on probation? Those questions are indicative of the obstacles Gipson would encounter in trying to serve two masters. Thus, Jackson's interests and Beltran's interests were too adverse for one attorney to represent both.

"[D]efense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem." *Holloway v. Arkansas*, 435 U.S. 475, 485-86, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978). Moreover, when an "'attorney [is] representing two defendants in a criminal matter[,] [the attorney] is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" *Holloway*, 435 U.S. at 485 (quoting *State v. Davis*, 110 Ariz. 29, 31, 514 P.2d 1025 [1973]). When the trial court is notified of a potential conflict of interest faced by a criminal defense attorney, the court is required to make an appropriate in-depth inquiry into the conflict. If an appropriate inquiry is made, the trial court's

20

decision to deny a motion to withdraw is reviewed under the abuse of discretion standard. See *State v. Stovall*, 298 Kan. at 370.

Here, the record lacks any evidence that Gipson ever told the trial court about his conflict of interest before Jackson entered his plea in this case. If Gipson had made the trial court aware of the conflict of interest, the trial court would have inquired about this conflict. Following this inquiry, Jackson would have either made an informed waiver of this conflict or, more likely, asked Gipson to withdraw as counsel. Because Gipson kept the conflict hidden from the trial court, he prevented the trial court from inquiring into the conflict of interest before accepting Jackson's plea.

The dissent, however, ignores Gipson's failure to inform the trial court of the conflict of interest. Surely defense attorneys should not be in a stronger position because they willfully fail to advise the trial court of a conflict of interest, thus precluding the court from making an appropriate in-depth inquiry into the conflict of interest, than they would be in if they had advised the court of the conflict of interest so that the court could make an in-depth inquiry into the conflict of interest. If so, defense attorneys could simply neglect to advise the court of a conflict of interest, thereby preventing the court from ever making an appropriate in-depth inquiry into the conflict of interest, as was done in this case.

To avoid drawing attention to this obvious conflict of interest, Gipson had an incentive to make sure Jackson pleaded guilty in this case. Indeed, Beltran was scheduled to testify against Jackson if this case went to trial. Moreover, if the State called Beltran as a witness, Gipson would have been required to impeach Beltran's credibility, possibly using Beltran's former criminal record. This would have created a situation of "divided loyalties" in Gipson's representation of Jackson and Beltran. Thus, Gipson's continued representation of both Jackson and Beltran clearly depended on Jackson accepting a plea deal with the State.

21

As stated earlier, a defendant has the right to conflict-free assistance of counsel. *Galaviz*, 296 Kan. at 176. When a conflict of interest adversely affects an attorney's representation of a defendant, that defendant is entitled to postconviction relief. *Galaviz*, 296 Kan. at 183-84. Here, the conflict of interest adversely affected Gipson's representation of Jackson because Gipson's representation of Jackson hinged on him serving two masters whose interests were clearly adverse to each other.

It is the function of defense attorneys to make the adversarial testing process work in their cases. The "'benchmark for judging any claim of ineffectiveness [as to counsel's performance] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. [Citations omitted.]'" *Boldridge*, 289 Kan. at 633 (quoting *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 [2007]). A part of the adversarial process is having a conflict-free attorney.

In Jackson's case, the adversarial testing process broke down. The State had listed Beltran as a witness in Jackson's upcoming trial. Thus, if there was the slightest possibility that the State would have called Beltran as a witness at Jackson's trial, Gipson's conflict of interest would have adversely hampered him, if not totally prevented him, from representing Jackson at the trial stage. Although the trial court denied Jackson's motion to withdraw plea, the trial court stated that Gipson's representation of both Beltran and Jackson was troubling. Indeed, because of the conflict of interest, Gipson rendered himself unable to make the adversarial testing process work in Jackson's case.

In *Lafler v. Cooper*, 566 U.S. ___, 132 S. Ct. 1376, 1384, 182 L .Ed. 2d 398 (2012), the United States Supreme Court held that the Sixth Amendment right to counsel extends to the plea-bargain process. Moreover, the United States Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1486, 176 L. Ed. 2d 284 (2010),

22

made clear that "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel."

Surely, if defendants receive and accept a so called good plea deal without ever making an informed waiver of the conflict of interest, this cannot trump their constitutional right to have a conflict-free attorney during their plea negotiations. Jackson was entitled to a conflict-free attorney to negotiate a plea deal with the State. Here, Gipson failed to provide Jackson with conflict-free representation during the plea negotiations with the State. Moreover, the record shows that neither Jackson nor Beltran made an informed waiver of Gipson's conflict of interest.

In summary, Gipson represented Jackson when the conflict of interest arose and, after that, Gipson negotiated a plea agreement that encompassed the very offense giving rise to the conflict of interest. Because the effect of Gipson's actual conflict of interest extended to the guilty-plea proceeding, it adversely affected the adequacy of his representation of Jackson during the plea negotiations with the State. As a result, we hold that Gipson's representation adversely affected Jackson's interests. Accordingly, we reverse Jackson's conviction and remand to the trial court with directions to grant Jackson's motion to withdraw plea.

* * *

TIMOTHY G. LAHEY, District Judge, assigned, dissenting: I respectfully dissent. Anytime a lawyer represents a defendant and has a current or prior attorney client relationship with a witness in the case, a potential conflict exists. In every such case, the attorney faces the theoretical obstacles set forth in the majority opinion. Yet, *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291, *reh. denied* 535 U.S. 1074 (2002), and *State v. Galaviz*, 296 Kan. 168, 291 P.3d 62 (2012), clearly show that despite the existence of conflicting loyalties, not every conflict results in an automatic reversal.

23

While Aaron Gipson was representing Deshawn Jackson, he was appointed to represent Francisco Beltran in a separate probation violation proceeding in an earlier case in which Beltran and Jackson were apparent accomplices. Beltran was an endorsed witness in this case against Jackson, hence the conflict. I agree with the majority that defense attorney Gipson concurrently represented Beltran and Jackson, that he did not obtain a written waiver of the conflict, and that he did not advise the court of the conflict. I disagree with the majority's analysis and conclusion that Jackson is entitled to a new trial on the basis of the conflict.

In the hearing before the district court, Jackson testified that Gipson never told him about his representation of Beltran. The district court heard evidence and rejected Jackson's claim. The court found that Gipson *did* disclose and discuss his representation of Beltran with Jackson. According to Gipson, when told of the conflict, Jackson said it was okay—Beltran was not really a witness to anything, and it was not an issue. More than 2 years later, Jackson is asking the court to set aside his plea because of a conflict he knew about all along.

The majority's criticism of Gipson's failure to obtain a written waiver and failure to advise the trial court of the conflict may well be justified under the Rules of Professional Conduct (KRPC). However, the KRPC are "not designed or intended to provide substantive or procedural law for criminal proceedings in district court." *State v. Stovall*, 298 Kan. 362, 372, 312 P.3d 1271 (2013). Gipson's failure to follow the KRPC by obtaining a written waiver of the conflict merely confirms the existence of the conflict. Gipson's failure to advise the court of the conflict does not change the test to be applied when evaluating the conflict—the attorney in *Mickens* also failed to advise the court of the conflict.

As explained by Justice Luckert, under *Mickens*, a defendant is not entitled to automatic reversal based on the defense attorney's conflict of interest if there was no

24

timely objection to the attorney's representation. *State v. Galaviz*, 296 Kan. at 170. Here, Jackson knew of the conflict and raised no objection. When a defendant knows of a conflict and does not object, the defendant bears the burden of showing that the conflict actually adversely affected the adequacy of the lawyer's representation. The defendant is, however, not required to show prejudice as required in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). Prejudice is presumed if the defendant shows the conflict significantly affected counsel's performance. *Mickens*, 535 U.S. at 172-73. Within the *Mickens* framework as explained in *Galaviz*, Jackson must do more than point to the conflict—he must establish that the conflict of interest had an adverse effect on his attorney's representation of him. This actual conflict of interest requirement means more than a mere division of loyalties; it requires a conflict that actually, not theoretically, affected counsel's performance. See *Mickens*, 535 U.S. at 171.

When challenging the performance of counsel, a defendant must do more than allege the potential for conflict, he must point to specific instances to support his contention. *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998). Jackson must come forward with evidence which shows the representation was *significantly* affected. See *Mickens*, 535 U.S. at 172-73.

What did Gipson do that was disadvantageous to his client? We know Jackson claimed that Gipson coerced the plea by threatening Jackson that he would receive the maximum sentence if he did not take the plea deal. But the trial court specifically rejected that contention. Beyond that specific allegation, Jackson's testimony at the motion to withdraw plea sheds no light on just what Gipson did or did not do that adversely affected the representation. When asked how Gipson's representation was deficient, Jackson said Gipson "knew Beltran was a witness on my case for the State, so he should have known to withdraw from my case or from Beltran's, one of the two."

25

The successful argument made by Jackson and accepted by the majority is that Gipson's "mindset" was affected when he was negotiating and explaining the plea deal. No evidence was presented describing what Gipson said or did when negotiating and explaining the plea deal that had an adverse effect on the representation. The majority cites no evidence or specific facts, beyond the existence of "divided loyalties" as the basis for reversing the trial court. Jackson has the burden of showing specific instances to support his contentions of an actual conflict of interest adverse to his interests and not merely a theoretical division of loyalties. See *Mickens*, 535 U.S. 171-73.

The majority summarized the "actual adverse affect" on the representation as follows:

> "To avoid drawing attention to this obvious conflict of interest, Gipson had an incentive to make sure Jackson pleaded guilty in this case. Indeed, Beltran was scheduled to testify against Jackson if this case went to trial. Moreover, if the State called Beltran as a witness, Gipson would have been required to impeach Beltran's credibility, possibly using Beltran's former criminal record. This would have created a situation of 'divided loyalties' in Gipson's representation of Jackson and Beltran. Thus, Gipson's continued representation of both Jackson and Beltran clearly depended on Jackson accepting a plea deal with the State." Slip op. at 22.

The district court made no finding that Gipson was motivated by a desire to avoid drawing attention to the conflict. To the contrary, the court found that Gipson actually drew attention to the conflict—he told Jackson about it, and Jackson had no objection to the dual representation. Jackson recognized that Beltran was not a witness to anything. Jackson's own testimony and the circumstances of the crime as disclosed in the record refute the other concerns expressed by the majority about the significance of Beltran as a possible witness.

26

The evidence in the record shows that the only witnesses to the actual events underlying the attempted murder, as well as the other crimes, were Jackson, the victim, and their 1-year-old daughter. Those events occurred at the victim's residence. Beltran was never at the victim's residence.

At the preliminary hearing, a police investigator testified that Jackson, after *Miranda*, *admitted* tying up the victim and putting tape over her mouth; forcing her into the bathtub and making her stay there; then taking the victim to his sister Lani's house; directing the victim go to a back bedroom; and then taking the victim, her 1-year-old daughter, and Lani to a gas station where the victim ultimately sought help.

The majority's reliance on *State v. Jenkins*, 257 Kan. 1074, 898 P.2d 1121 (1995), as a factually similar case is misplaced. In *Jenkins*, the defense lawyer's conflict was his representation of the victim who was the primary witness against the lawyer's client. The facts here show that Beltran was present at Lani's house when Jackson brought the victim to her house, *after* the attempted murder. The record is devoid of any factual suggestion or circumstance that would indicate Beltran had any material information about the crime—he was not a witness to any material element of the crime, and nothing in the record reflects Jackson told him anything about the crime or that Beltran ever made any statement to authorities. In no way is Beltran a key witness as was the case in *Jenkins*.

The record before us does not even show that Jackson's and Beltran's interests were actually adverse. We know that Jackson did not think they were adverse because he told Gipson that he did not object to the representation of Beltran because Beltran "really was not a witness to anything, not an issue." The evidence in the record bears out Jackson's statement.

The testimony at the preliminary hearing, combined with the admissions by the defendant, demonstrate that Gipson obtained a highly favorable plea agreement for

27

Jackson. The evidence shows the defendant voluntarily and knowingly entered his plea with full knowledge of the consequences. He testified he decided to take the plea because he was worried about the possible sentence he could receive based on the multiple original charges. The plea to a single amended charge significantly reduced defendant's potential sentence. Jackson knew Gipson was representing Beltran, he knew that Beltran was listed as a witness for the State, and he did not object. The district court's finding that there was no manifest injustice is supported by substantial competent evidence.

The effect of the majority opinion is to grant an automatic reversal in favor of Jackson solely because he did not have conflict-free counsel. Every conflict case creates a situation of "divided loyalties," but not every case results in an automatic reversal. Under *Mickens* and *Galaviz*, when a defendant knows of a conflict and fails to object, the defendant must show the conflict had a significant actual effect on the adequacy of counsel's representation. I would find Jackson has failed to make the required showing and affirm the district court's denial of Jackson's motion.