NOT DESIGNATED FOR PUBLICATION

No. 126,026

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STRATEGIC ENERGY INCOME FUND III, L.P.,
*Appellant/Cross-Appellee*,

v.

STEPHENS ENERGY GROUP, LLC, ALAMEDA OILFIELD SERVICES TRUST created under the
DONALD C. SLAWSON IRREVOCABLE GST TRUST, SLAWSON EXPLORATION
COMPANY, INC., and MBI OIL AND GAS, LLC,
*Appellees/Cross-Appellants*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Oral argument held May 1, 2024. Opinion filed August 2, 2024. Affirmed.

*Michael R. Perri*, pro hac vice, *Jason A. Dunn*, and *Socorro Adams Dooley*, pro hac vice, of Perri Dunn PLLC, of Oklahoma City, Oklahoma, for appellant/cross-appellee.

*Matthew J. Salzman*, of Holland & Hart LLP, of Mission Hills, *David E. Bengtson*, of Stinson LLP, of Wichita, and *Logan T. Fancher*, of Stinson LLP of Kansas City, Missouri, for appellee/cross-appellant Stephens Energy Group, LLC.

*James M. Armstrong* and *David E. Rogers*, of Foulston Siefkin LLP, of Wichita, and *Daniel J. Buller*, of Overland Park, for appellees/cross-appellants Alameda Oilfield Services Trust, created under the Donald C. Slawson Irrevocable GST Trust, and Slawson Exploration Co., Inc.

Before CLINE, P.J., ATCHESON and PICKERING, JJ.

CLINE, J.: This case involves a dispute between former business partners over the sale of interests in a pipeline built to transport gas produced by oil wells on oil and gas

leases owned by the business partners or their associated entities. Strategic Energy Income Fund III, L.P. (Strategic), asserted various contract and tort claims against its former business partners, Slawson Exploration Company, Inc. (Slawson), Alameda Oilfield Services Trust (Alameda), MBI Oil & Gas LLC (MBI), and Stephens Energy Group, LLC (Stephens), an unrelated third party who purchased Alameda's and MBI's interests in the pipeline. Although MBI was dismissed at some point during the lawsuit, Slawson, Alameda, MBI, and Stephens will be collectively referred to as Defendants.

While the parties appealed several district court decisions on various pretrial motions, the dispositive ruling on appeal is the district court's order granting Defendants' summary judgment on Strategic's damages claim. The district court found the damage theory—Strategic's lost opportunity to profit from its anticipated purchase and then flip sale of the pipeline—was too speculative and remote to survive summary judgment. The only evidence Strategic offered to calculate its damages was an expert report which contended the sale price of Alameda's and MBI's 56% interest in the pipeline was approximately half the fair market value of that interest. But the district court found that expert report did not provide a reasonable standard to calculate Strategic's damages because it ignored relevant facts and was based on unrealistic assumptions without a sound evidentiary basis.

After thoroughly reviewing the record and considering the parties' arguments, we find the district court did not err in granting summary judgment. Strategic failed to provide facts upon which a fact-finder could reasonably infer that it could have sold the pipeline on more advantageous terms than the terms of the actual sale. Strategic's assertion that it could have sold the pipeline for a higher price is speculative and thus insufficient as a matter of law for its failure to consider material facts and for its reliance on conjecture which is not reasonably based on evidence in the record. As a result, we affirm the district court's order granting summary judgment in Defendants' favor. We also

find the district court did not abuse its discretion in denying Strategic's motion to amend the pretrial order and affirm that decision as well.

FACTUAL AND PROCEDURAL BACKGROUND

*Development of the Nemaha Project Area and construction of the Nemaha Pipeline*

In April 2011, Slawson, U.S. Energy Development Corporation (U.S. Energy), and Osage Exploration and Development, Inc. (Osage) partnered in the development of Oklahoma oil and gas leases collectively known as the Nemaha Project Area. Slawson was named operator of all wells and owned a 45% working interest in the Nemaha Project Area. U.S. Energy owned a 30% working interest and Osage owned a 25% interest. Slawson worked with Energy Financial & Physical, LP (EFP), to market their gas.

The Nemaha Project Area production soon became more than the infrastructure and logistics in place could handle. So, in mid- to late-2012, Slawson looked to Enable, a major interstate pipeline carrier, to help with its anticipated capacity issues. A decision was made to build the Nemaha gas gathering system (Nemaha Pipeline) and connect it to Enable.

Nemaha Gas Gathering Systems, LLC (Nemaha Gas), was formed to own and operate the Nemaha Pipeline. While four entities signed the Nemaha Gas Operating Agreement—Alameda, Strategic, MBI, and Slawson—the ownership interests were split among three of them: Alameda (51%), Strategic (44%), and MBI (5%). Relevantly, Alameda's principal owner is Slawson. Slawson was also named the operator of the Nemaha Pipeline.

Negotiations began among several of these entities to execute a gas gathering agreement that would dedicate gas to the Nemaha Pipeline. The parties dispute whether any formal contract was officially and legally executed, and in fact, this issue was the subject of a separate motion for summary judgment filed below. But since our decision on the motion for summary judgment on damages renders the decision on that motion moot, we need not address the parties' dispute about the gas gathering agreement in detail. While the parties negotiated, Nemaha Gas and EFP worked together on a month-to-month basis and gas began flowing through the Nemaha Pipeline in September 2013.

*Stephens' pursuit of Slawson's, Alameda's, and MBI's interests in the Nemaha Pipeline*

Before the fall of 2014, Slawson was approached by potential purchasers of Slawson's leasehold interests in the Nemaha Project Area. Stephens was one of those potential purchasers. Some, but not all, of Slawson's leasehold interests in and around the Nemaha Project Area were connected to the Nemaha Pipeline. If Slawson sold its leasehold interests in and around the Nemaha Project Area, Slawson wanted to end all business connections in that area. This meant for Slawson, that Alameda's interest in the Nemaha Pipeline should also be sold. And in turn, Slawson also wanted to transfer and end its responsibilities as well operator in the Nemaha Project Area. MBI joined Alameda in the desire to sell its interest in the pipeline.

On July 25, 2014, Stephens agreed to pay $91,850,000 to Slawson to buy Slawson's 45% working interests in certain oil and gas leases and oil wells in the Nemaha Project Area in a Purchase Sale Agreement (PSA). The parties also contemplated transferring Slawson's duties and responsibilities as well operator in the Nemaha Project Area to Stephens. Stephens' purchase of Slawson's 45% interest in the Nemaha Project Area left U.S. Energy with its 30% working interest as well as Osage's 25% interest. U.S. Energy is the managing general partner of Strategic.

4

A few days later, Stephens agreed to buy a 56% interest in Nemaha Gas—51% from Alameda and 5% from MBI. The collective purchase price was $10,995,833.33. Under this purchase, Strategic would continue to own the remaining 44% interest in Nemaha Gas. The parties executed agreements making the closing of the sale of the oil and gas leasehold interests and the closing of the sale of the interests in Nemaha Gas—the pipeline—essentially reciprocal obligations. The closing date for both purchases was set for September 18, 2014.

Shortly after the purchase agreements were executed, Nemaha Gas notified Strategic of the proposed sale of Alameda's and MBI's membership interests in Nemaha Gas to Stephens. Pertinently, this notification was sent to Strategic, in part, because Strategic had a right of first refusal to buy those interests under the Nemaha Gas Operating Agreement.

In September 2014, Stephens closed its leasehold transaction with Slawson and became the well operator and 45% owner of the oil wells in the Nemaha Project Area. But Stephens did not close on the pipeline transaction with Alameda and MBI because U.S. Energy, on Strategic's behalf, gave notice that Strategic intended to exercise its right of first refusal to buy Alameda's and MBI's Nemaha Gas interests.

Upon purchasing Alameda's and MBI's interests, Strategic would then own 100% of the Nemaha Pipeline. But it did not intend to maintain ownership or operate the pipeline. Instead, Strategic intended to "flip" sale the pipeline to an unidentified potential buyer within 30 to 60 days. Alameda and Slawson agreed to delay the closing on the sale of the interests in the Nemaha Pipeline to Stephens so that Strategic could continue marketing the pipeline and determine whether it could find a purchaser. Unfortunately, crude oil prices plummeted in the fourth quarter of 2014.

Apparently, Strategic and U.S. Energy tried to sell the Nemaha Pipeline to several companies during this time. Canyon Mainstream, one of the interested buyers, never "put a price on the pipeline." Another potential buyer, Tall Oak, initially provided a nonbinding offer of $26 million, which was based in part on a proposed well drilling schedule of 288 wells in addition to the existing 32 wells in the Nemaha Project Area. Strategic had formulated this well drilling schedule and provided it to both Canyon and Tall Oak. But Stephens, as the potential and then actual operator of the Nemaha Project Area and Nemaha Pipeline, contends it only intended to drill another 108 wells. Once Tall Oak exercised significant due diligence, especially related to Strategic's representations about a drilling schedule for the Nemaha Project Area, Tall Oak dropped its nonbinding offer down to $12 million for the pipeline. The "primary driver" that caused Tall Oak to drop its offer was the volume assumptions—that is, Tall Oak's lack of "'confidence in the number of wells that were going to be drilled.'"

After Strategic's intended sale of the Nemaha Pipeline to Tall Oak fell through, U.S. Energy notified Slawson that it no longer intended to exercise its right of first refusal to buy Slawson's interest in Nemaha Gas. Stephens eventually closed on its purchase of Slawson's, Alameda's, and MBI's interests in Nemaha Gas.

*Strategic's lawsuit*

After the sale of the Nemaha Gas interests closed, Strategic sued Defendants, alleging they took various actions which impaired Strategic's ability to "flip sale" the Nemaha Pipeline for a profit. Strategic sought damages in the form of the profit Strategic alleged it would have made on the flip sale and the $500,000 earnest money it paid to exercise its right of first refusal. MBI was later dismissed from the lawsuit, as were Strategic's claims seeking return of its earnest money deposit.

At the start of the case, Defendants succeeded in striking Strategic's jury trial demand based on the terms of the parties' Operating Agreement and in obtaining a dismissal of some of Strategic's claims. Later, the district court denied Strategic's request to amend the pretrial conference order to assert a host of new claims. The court then granted two of three summary judgment motions filed by Defendants. While the parties appeal (and cross-appeal) all these decisions, they agree the disposition of this appeal hinges on Defendants' summary judgment motion on damages since all of Strategic's remaining claims require a showing of damages. We therefore focus on that decision.

That said, we are not convinced that disposition of the summary judgment motion on damages necessarily disposes of Strategic's appeal of the denial of its motion to amend the pretrial order. As a result, we will address that decision as well.

DID THE DISTRICT COURT ERR IN GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON DAMAGES?

In one of their motions for summary judgment, Defendants asserted Strategic failed to establish that it suffered damages from Defendants' alleged wrongful actions. Defendants argued that Strategic's damages theory—its lost opportunity to profit from the intended flip sale of Nemaha Gas—was not "tethered to reality." The district court agreed, finding Strategic's theory was too speculative and remote to survive summary judgment.

The disagreement between the parties on this issue boils down to the valuation of Nemaha Gas. Stephens purchased Alameda's and MBI's combined 56% interest in the pipeline for just under $11 million. Extrapolating that price produces a value for 100% of the pipeline of around $20 million. But Strategic's expert, James Harden, valued Nemaha Gas at $47 million. Based on Harden's projection, Strategic claimed it could have turned a profit of over $21 million after exercising its right of first refusal to buy Alameda's and

MBI's 56% interest for approximately $11 million and then flip selling a 100% interest in the pipeline for Harden's proposed value of $47 million.

The core difference between these two valuations is the parties' disparate well drilling projections. Harden reached the $47 million valuation, in part, based on Strategic's projection that 320 oil wells could be drilled for full development of the Nemaha Project Area. Defendants contend Strategic's 320-well projection is inflated and speculative because Stephens—the operator—only intended to drill 140 wells.

Defendants also claim Strategic's damages are speculative because Strategic's damages valuation is not based on "what an actual willing buyer [i.e., Stephens] would pay." They pointed out the fair market value of the pipeline is best evidenced by the amount Stephens paid the willing sellers (Alameda and MBI). They noted Strategic did not produce evidence that any buyer would pay the "extraordinary price" postulated by Harden for the pipeline.

In granting Defendants' motion for summary judgment on damages, the district court found Strategic's damage theory was speculative for its failure to consider relevant facts and reliance on unrealistic assumptions. First, it found Harden's calculation of Strategic's damages ignored the well operator's projections for drilling additional wells and the total wells planned as of September 2014 (which the parties agree is the relevant date of valuation). The court found this fact should have been made known to Harden for the formulation of his expert opinion per K.S.A. 2023 Supp. 60-456(b)(1) and, indeed, Harden admitted this fact is important. Yet, despite the availability of this information, he failed to consider it.

The district court also agreed with Defendants that Strategic's damage theory unrealistically presumed the existence of a buyer for 100% of the pipeline at Harden's price at or around the time of the September 2014 closing, even though Strategic could

not find one by then when it tried to market the pipeline. It described Harden's valuation as "surreal in comparison to the real world value negotiated by the parties" to the sales transaction and found the agreed sale price of $10,995,833.33 "is the only reliable number" to calculate the fair market value of the pipeline.

On appeal, Strategic argues the district court erred by misapplying the standards governing a motion for summary judgment. Strategic contends the court engaged in credibility determinations, weighed evidence, and resolved conflicting evidence in favor of Defendants, all of which are generally inappropriate at the summary judgment stage. It focuses on the court's evaluation of Harden's expert report and its finding that Stephens' purchase of Alameda's and MBI's interests was an arm's-length transaction. Defendants assert the court properly evaluated whether Strategic provided legally admissible evidence to support its damages claim.

A. *Standard of review*

The standards governing summary judgment are well-settled. A party seeking summary judgment must show, based on appropriate evidentiary materials, that there are no disputed issues of material fact and therefore judgment may be entered in its favor as a matter of law. *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018). Defendants contend there are no factual disputes for a fact-finder to resolve at trial because Strategic's damages theory is factually unsupported. And since damages are an essential element of Strategic's remaining claims, Defendants believe they are entitled to judgment as a matter of law.

When a party moves for summary judgment based on an absence of facts to support an essential element of the nonmoving party's claim, that nonmoving party has the affirmative duty to come forward with facts to support its claim. *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 (2015). So Strategic needed to provide

9

facts from which a fact-finder could reasonably infer it suffered damages. Although Strategic was not required to prove its case, it cannot avoid summary judgment based on speculation. *Chesbro v. Board of Douglas County Comm'rs*, 39 Kan. App. 2d 954, 960, 186 P.3d 829 (2008).

In determining Defendants' motion, both the district and appellate courts must resolve all facts and inferences which may reasonably be drawn from the evidence in Strategic's favor. *Patterson*, 307 Kan. at 621. We cannot assess witness credibility or weigh conflicting evidence. *John Doe v. M.J.*, 59 Kan. App. 2d 273, 293, 482 P.3d 596 (2021). But this does not mean the district court can abandon its responsibility to ensure that speculative and problematic evidence does not reach the fact-finder at trial. *Vickers v. Wichita State University*, 213 Kan. 614, 620, 518 P.2d 512 (1974). "'The issue of damages should not be submitted to the jury if no evidence has been presented to support an award of damages.'" *Kansas Lawn & Garden, Inc. v. Associated Wholesale Grocers, Inc.*, No. 83,959, 2000 WL 36746225, at *5 (Kan. App. 2000) (unpublished opinion) (quoting *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 740, 822 P.2d 617 [1991]).

B. *The district court properly found Harden's expert valuation did not provide a reasonable basis for calculation of Strategic's damages.*

The ultimate question is whether Strategic produced sufficient evidence to allow its claim for lost expectation damages to go to trial. Strategic acknowledges: "To warrant recovery for damages, there must be some reasonable basis for a computation to enable the trier of fact to arrive at an estimate of the amount of the loss. [Citations omitted.]" *Burnette v. Eubanks*, 308 Kan. 838, 857, 425 P.3d 343 (2018). "Absolute certainty in proving loss of future profits is not required," but the fact-finder must be "guided by some rational standard." *Vickers*, 213 Kan. at 620.

10

The district court found Harden's report did not provide a reasonable basis or standard for computing Strategic's damages because it ignored relevant facts and relied on unfounded assumptions. And "[r]ecovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement." *McKissick v. Frye*, 255 Kan. 566, 591, 876 P.2d 1371 (1994). "'[S]peculative damages'" are "'[p]rospective or anticipated damages from the same acts or facts constituting the present cause of action, but which depend upon future developments which are contingent, conjectural, or improbable.'" *CoreFirst Bank & Trust v. JHawker Capital*, 47 Kan. App. 2d 755, 774, 282 P.3d 618 (2012) (quoting Black's Law Dictionary 392 [6th ed. 1990] and finding lost profit theory of damages was too speculative when record did not support prospective home sale prices on which theory was based). Expert testimony that is speculative does not provide a reasonable basis for a trier of fact to calculate damages.

Strategic argues the district court erred in finding that Strategic's expert was "uninformed or ignored certain material facts" and that his calculation was based on an "unreliable" 320-well projection. It also claims the court erred in finding the "transaction between Alameda and Stephens was, in fact, an arm's length transaction." It contends the court improperly made credibility findings and weighed the evidence in Defendants' favor when making these determinations.

> 1. *The uncontroverted facts show Harden did not consider Stephens' drilling plans when valuing the pipeline.*

Strategic claims the district court improperly assessed the evidence when it found Harden did not consider Stephens' drilling plans because it says Harden did, in fact, consider those plans. There are two problems with this assertion:  (1) It is directly contradicted by Harden's testimony, and (2) Strategic provides no evidentiary support for it.

11

First—as Strategic admits—Harden testified he did not see or review any drilling plans provided by Stephens. Harden admitted his calculations were based on the 320-well projection developed by US Energy. Strategic provided no evidence to controvert these facts.

Next, the block quote Strategic relies on to support its assertion that "Harden, in fact, considered Stephens' drilling plans" is misleading and unsupported by the record. The record citation Strategic provided for this "quote" is neither Harden's expert report nor his rebuttal report. Instead, the citation is to an affidavit by Todd Witmer, the Vice President of Corporate Development at U.S. Energy. And, inexplicably, the block quote provided in Strategic's brief is not found in Witmer's affidavit. To be sure, bits and pieces of sentences from the block quote can be found in the affidavit, but it is not a direct quote from the affidavit, as it purports to be in Strategic's brief. Nor does the quote address the number of wells Stephens planned to drill—it referenced a projection of the number of drilling rigs Stephens planned to utilize ("two rigs as of October 1, 2014, three rigs as of February 1, 2015, and four rigs as of November 1, 2015"). Strategic does not connect how Harden's expert calculation relates to Whitmer's affidavit nor does it explain how the number of drilling rigs evidences how many wells will be drilled by those rigs.

Stephens correctly notes that Strategic "cannot point to anything" in the record that shows its expert "consider[ed] the well operator's drilling plan" of 140 wells. We see no error in the district court's determination that Harden ignored this fact.

> 2. *Strategic fails to show the 320-well projection was a reliable number on which to base its damages claim.*

Strategic challenges the district court's finding that its 320-well projection was unreliable by claiming the finding was based on an incorrect conclusion. Strategic says the court incorrectly concluded the 320-well projection was extrapolated from a pre-

development well drilling model created by Slawson in 2012 when deciding whether to build the pipeline. Instead, Strategic claims the 320-well projection was based on Stephens' drilling plans (again, citing Stephens' projection of drilling rigs) and other assumptions—including well spacing models used by offset operators and Strategic's belief that an additional formation covered by the leases would be productive. But Strategic's argument mischaracterizes the record and misses the point.

To begin, Strategic can hardly complain about the district court's conclusion when Strategic itself cited the 2012 Slawson model to support its assertion that its damages calculation was "based upon reliable facts and data." And not only did Strategic say that U.S. Energy's 320-well projection was created "[i]n light of" Slawson's 2012 model, but, when defending the reasonableness of Harden's projection, Strategic argued it was in line with Slawson's model. Strategic also argued Harden reviewed Slawson's model when attempting to excuse Harden's failure to consider Stephens' drilling plans.

Strategic's use of the Slawson model to defend U.S. Energy's 320-well projection was problematic because, as Defendants pointed out, that model was abandoned after drilling began and the gas volumes did not meet the parties' expectations. Strategic's reliance on the model is one of the reasons the district court discounted the 320-well projection as reliable or relevant to value the pipeline, noting it was also in direct conflict with the operator's plans. Strategic cannot now credibly challenge the basis for the court's conclusion when Strategic is the one who provided it.

Strategic does not argue on appeal that the 2012 model is relevant nor does it dispute Defendants' contentions about why that model is outdated. Instead, as noted above, it pivots and argues the 320-well projection was based not on the 2012 model but on Stephens' drilling rig projections and other assumptions about how the leases which serve the pipeline could be developed. But Strategic's shift in position on appeal does not

13

persuade us that the district court incorrectly concluded that Harden ignored the operator's well projection and he was wrong to do so.

As noted above, Strategic does not explain how Harden's use of a 320-well projection which may have relied, in part, on a drilling rig projection, is a sufficient substitute for the operator's actual well projection. As Slawson and Alameda put it: "It is not the number of rigs that are planned to be in use at any one time that is relevant; it is the total number of wells that are planned." And whether U.S. Energy's forecast about the potential productivity of another formation or its use of offset operator's well spacing models to formulate a 320-well projection are reliable is beside the point. The district court found it was the omission of the well operator's drilling plans in computing damages that undercut Harden's valuation—because Harden relied on speculation about *potential* wells that could be drilled by an *unknown* operator rather than relying on the *definite* number of wells the *actual* operator planned to drill.

Strategic does not address the reason the district court found Harden's omission important: which is because Harden himself testified that it "'certainly would'" have impacted his value analysis if he had known "'the operator had a model that had drastically lower or a stark difference, meaning lower volumes, than the model [he was] using to project [his] discounted cash flows.'" This admission alone would seem to undercut the reliability of Harden's valuation. But Strategic also does not address the following facts, which the district court found Strategic failed to controvert:

(1)   Tall Oak's representative testified that he would never have closed on the pipeline without talking to the well operator and finding out how many wells Stephens intended to drill in the acreage. He also testified that no prudent purchaser of a pipeline would buy a pipeline without speaking to the operator to figure out how many wells the operator intended to drill, and that he would

14

never purchase a pipeline asset without talking to the well operator to figure out how many wells the actual well operator intended to drill.

(2) A U.S. Energy representative admitted that anyone buying a pipeline would want to talk to the well operator about how many wells they plan to drill.

(3) Tall Oak did not find the 320-well projection reliable and, after determining the "accurate drilling projection was significantly less than [Strategic's] representations," dropped its purchase offer to $12 million for the pipeline.

Based on these facts, the district court found "the oil well operator's planned number of wells is a fact that could not be ignored by an expert to arrive at a value." Whether *other* facts on which the expert's valuation depended were reliable is irrelevant to this conclusion.

The district court concluded Harden's opinion was too speculative to assist the fact-finder at trial because he failed to consider factors which affect the conclusions he reached. *Kemp v. Tyson Seafood Group, Inc.*, No. CIV. 5-96-173 JRT/RLE, 2000 WL 1062105, at *9 (D. Minn. 2000); see also *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1041 (8th Cir. 1999) (affirming lower court's decision to exclude expert testimony that failed to consider "all independent variables that could affect the conclusion"). Strategic's reference to other facts which Harden may have considered does not cure this foundational problem.

3. *The district court did not need to first decide a motion on Harden's expert qualifications or the validity of Harden's opinion before finding his opinion unreliable.*

Strategic next argues the district court could not determine Harden's opinion was unreliable without first deciding a motion to challenge Harden's qualifications or the

15

validity of his opinion. Strategic cites *In re Care & Treatment of Jones*, 57 Kan. App. 2d 808, 816-17, 459 P.3d 827 (2020), to contend: "Absent a challenge to an expert's qualifications or to the validity of the expert's opinion—challenges not made here—summary judgment is not available when one expert's testimony supports each element of a party's claim." Strategic's reliance on *In re Care & Treatment of Jones* is misplaced for two reasons.

First, Defendants did challenge the validity of Harden's opinions. They contemporaneously moved to exclude Strategic's expert testimony with their summary judgment motion on damages. The motion to exclude includes similar arguments to those in their summary judgment motion on damages: Harden's reliance on the 320-well projection fails to satisfy the standard under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and Harden's expert opinion "ignores real-world facts relating to what a willing buyer paid for" Nemaha Gas. As Defendants point out, the district court simply chose to address Defendants' concerns with Harden's expert testimony in deciding Defendants' motion for summary judgment on damages.

Second, this case is not on all fours with *In re Care & Treatment of Jones*. *Jones* involved competing expert opinions over whether the defendant met the criteria to be classified as a sexually violent predator subject to civil commitment. The first expert hired by the State felt that he did, but the second expert felt he did not. The district court followed the second expert's recommendation and granted the defendant's motion to dismiss the State's case for civil commitment. On appeal, this court treated the motion to dismiss as one for summary judgment since the district court relied on matters outside the pleadings. 57 Kan. App. 2d at 815. It found the court erred in granting the motion because it had been presented with a disagreement among experts—the type of dispute normally resolved at trial. 57 Kan. App. 2d at 817.

16

But a significant difference between *Jones* and this case is no one had challenged the first expert's qualifications or the validity of that expert's opinion in *Jones*. Without such a challenge, the expert's testimony stood and, importantly, supported each element of the State's claim. In *Jones*, we found the district court erred by simply believing the second expert over the first when no one had challenged the basis for the first expert's opinion. And we found dismissal (or summary judgment) was improper since there was evidence in the record to support each element of the State's claim. 57 Kan. App. 2d at 816-17.

In contrast, Defendants challenged the validity of Harden's expert opinions—both in a separate *Daubert* motion and via their motion for summary judgment. The district court here did not face a simple disagreement among experts, but a challenge to the foundation of the expert's opinions—which provided the only evidence of Strategic's damages claim. And unlike in *In re Care & Treatment of Jones*, the district court found that Harden's expert testimony did not support each element of Strategic's claims because he ignored relevant facts.

Strategic tries to characterize the district court's decision as a choice between competing "valuation model[s]." But, as Defendants point out, that is not what happened. Defendants did not propose a theoretical "valuation model"—they relied on the real-world transaction entered into between a willing buyer and willing sellers. Strategic's expert relied on a hypothetical drilling number proposed by U.S. Energy to market the pipeline (which at least one potential purchaser did not believe), while Defendants relied on the evidence several witnesses testified would be important to the valuation of the pipeline—the operator's actual drilling plan. And as the district court noted, when you substitute the operator's projected drilling plan for 140 wells into Harden's damages calculation, the result values the pipeline close to the actual sale price (starkly reducing the valuation from $47,000,000 to $19,861,402).

17

Strategic mischaracterizes the district court's factual findings, claiming the court did not consider "the disputed material facts" and granted summary judgment merely because the district court believed Defendants would prevail at trial. It focuses on a comment the court made when describing the general posture of the case:

> "Motions for summary judgment are to be determined based on the uncontroverted facts. Most commonly, any controverted fact would later be resolved by a jury. Because this case is set for a bench trial, contrary to the norm, this court will be and is the fact finder for this case and is the one who will weigh evidence."

Strategic contends this statement means the court did not apply summary judgment standards, but instead, weighed the evidence since it would be the ultimate fact-finder at trial. But Strategic overemphasizes this statement. The court was generally commenting on the summary judgment standard, then customized that standard to identify that the court, not a jury, would be the ultimate fact-finder. The court did not say this context meant it could weigh the evidence at the summary judgment stage, nor does Strategic identify any specific facts to which it claims the court was referring. Rather than weighing the facts, the court found Strategic did not controvert the material facts presented by Defendants. And based on those uncontroverted material facts, it found Strategic's damage theory was without evidentiary support.

Strategic correctly points out that the district court must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. *Patterson*, 307 Kan. at 621. But in giving Strategic the "benefit of the doubt," so to speak, the court cannot ignore known facts or rely on assumptions which are not based on or are contradicted by those facts. Yet Strategic's damages theory does just that. Strategic's profit projections hinge on conjecture about a phantom price it could have received from a phantom buyer—which is twice the amount

18

paid by an actual buyer—and Harden's analysis ignores the operator's well drilling projections—a fact which he admits is important to the valuation of the pipeline.

We agree with the district court that Harden's valuation is not legally sufficient to support Strategic's damage theory since he ignores facts that he admits are relevant and speculates about others. Expert testimony that is speculative is not competent proof and does not provide a legally sufficient evidentiary basis for a damages claim. Since all the damages sought by Strategic derive from its expert's estimate of the fair market value of the Nemaha Pipeline, Strategic has no other evidence to support this essential element of its remaining claims. We see no error in the district court's decision granting summary judgment on damages to Defendants. See *Osage Capital v. Bentley Investments of Nevada*, No. 109,786, 2014 WL 902189, at *7 (Kan. App. 2014) (unpublished opinion) ("[A] plaintiff opposing a motion for summary judgment must furnish evidence on each element of the claim alleged, to prevent a summary judgment on that claim.").

C. *The district court correctly determined there was an arm's-length transaction between Stephens, Alameda, and MBI to buy the Nemaha Pipeline.*

Neither side disputes that fair market value is the correct basis for calculating Strategic's damages. As the district court noted, "'Fair market value' is defined in common law (absent statute) as '[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction[.'] Black's Law Dictionary, Seventh Edition, p. 1549 (1990)." Defendants assert that the purchase price is the only reliable measure of fair market value. Strategic disputes the validity of the purchase price as a reliable measure of the fair market value of the pipeline by challenging whether it arose out of an arm's-length transaction.

Besides Strategic's concerns with the district court's assessment of Harden's opinion, it argues the district court erred when it found Defendants' assertion that

Stephens' purchase of Alameda's and MBI's interests in the pipeline was an arm's-length transaction was uncontroverted. It claims the district court improperly weighed evidence and determined credibility when it found the agreed sale price was "the only reliable number for the Fair Market Value of Alameda's and MBI's total interests" in the pipeline. Strategic asserts the district court's contention is incorrect because "Stephens stated repeatedly that it never wanted the Pipeline." Thus, according to Strategic, Stephens was not a willing buyer and its purchase of Alameda's and MBI's interests in Nemaha cannot represent the fair market value of the pipeline. Strategic argues that whether the price paid was fair market value presents a fact question and summary judgment is therefore not appropriate.

The district court found Stephens' purchase of Alameda's and MBI's interests was an arm's-length transaction, in part, because Strategic's response to Defendants' statements of fact about this issue was "three and a half pages of argument instead of a clear concise controversion." And "[b]ecause of Plaintiff's failure to be concise and Plaintiff's conflicting argument, the Court accepts Defendant[s'] concise assertion in [the Defendants' statement of facts] of an arm's length transaction as true."

To support its contention that Stephens was not a willing buyer, Strategic cited a conversation among U.S. Energy President Doug Walch, Alan Martinkewicz, and Lee Dawkins, general counsel for Stephens. Although Strategic does not describe who and how Martinkewicz is related to the case, another piece of evidence in the record reveals that as of September 16, 2014, he was vice president of land for Stephens. In the phone conversation, from November 6, 2014, Martinkewicz stated:

> "Well again, Doug, from the bottom of my heart, we don't want the pipeline. We just would offer to run it because we're going to be out there operating it; it makes sense to do it. It's not something we're after here. We just—at the end of the day, we just thought, if you want—the truth of the matter is, we're buying the assets. We're going to

20

have people out there. We could have had 50 some, 56 percent interest in it. And so it made sense to operate it. We never looked at it's going to be a money-making, you know, home run in and by itself as a pipeline. It's running 10, 12 percent of the total funds that are—the money's in the oil production. So that's what we're focused on."

Strategic does not explain how this statement shows Stephens is an unwilling buyer and therefore, the transaction is not arm's-length. To be sure, Martinkewicz explicitly stated in this conversation that Stephens was not interested in the Nemaha Pipeline alone. But as he explained, even if Stephens did not want to own the pipeline, it made sense if it was going to own large interests in the Nemaha Project Area, that it would operate the wells and pipeline.

As Defendants argue, that does not mean Stephens was an unwilling buyer because "companies willingly do things all the time that they may not have a strong desire or even want to do." Defendants contend that simply because Stephens had no real desire to own the pipeline does not make Stephens an unwilling buyer. While Stephens did not want to buy an interest in the pipeline, standing alone, it did so because it was part of a package deal with Slawson's much more valuable interests in the leases and oil wells, which Stephens did want. So, Stephens willingly bid on both assets and negotiated the terms of the purchase of the leases and wells with Slawson, and the terms of the purchase of the interest in the pipeline with Alameda and MBI. Strategic points to no evidence of any duress or other factors that would disqualify Stephens from being a "willing buyer" in the sense of a free market or fair market value. Plus, Strategic fails to cite any other evidence indicating Stephens "repeatedly" stated it never wanted the Nemaha Pipeline.

Strategic also fails to address the district court's point that its argument is internally inconsistent. For one, as the court noted, if Alameda's and MBI's interests in the pipeline were undervalued in the package deal, evidencing Stephens did not want the pipeline, then why did Strategic not exercise its right of first refusal to buy the pipeline at

21

the undervalued price? This strategy would have maximized its profit potential. And as Defendants' point out, Strategic's argument is inconsistent with its overarching theory of the case—which is that Defendants conspired together to skuttle Strategic's exercise of its right of first refusal over the pipeline. If Stephens did not want the pipeline, then why would it be willing to commit wrongdoing to get it?

Given Strategic's failure to controvert the relevant facts, we find the district court did not err when it concluded the transaction between Stephens, Alameda, and MBI was arm's-length and thus the purchase price was evidence of the fair market value of the pipeline.

D. *Strategic has no legally sufficient evidence to support its damages claim.*

Strategic's damage theory speculates that a potential buyer would operate the lease differently than the current operator and therefore value the lease differently. But it offers no evidence to support its conjecture—as the district court noted, Strategic produced no evidence that such a buyer existed, or any evidence on which a fact-finder could reasonably infer the existence of such a buyer. As the court also noted, Defendants even extended the closing deadline to allow Strategic to find such a buyer, to no avail. The bottom line is that no willing buyer who assessed the potential for buying a 100% interest in the pipeline presented a certain offer anywhere close to Strategic's expert's valuation once the operator's drilling plan was accounted for. To be sure, we do not hold that a purchase price is the only appropriate measure of damages. Rather, simply that Strategic's alternative measure is speculative, and therefore insufficient as a matter of law, for its failure to account for material facts and for its reliance on conjecture which is not reasonably based on evidence in the record.

Damages are an essential element to all of Strategic's remaining claims, and Strategic has failed to produce evidence that a buyer would have paid a price for the

pipeline that would have resulted in a loss to Strategic. That is, it produced no credible evidence to support its lost expectation damages theory. Without proof of damages, all Strategic's remaining claims necessarily fail.

DID THE DISTRICT COURT ERR IN DENYING STRATEGIC'S
MOTION TO AMEND THE PRETRIAL ORDER?

About a month after the final pretrial order was entered, Strategic moved to amend that order to add an alternative allegation against Slawson concerning Slawson's alleged failure to discharge its duties as operator of Nemaha Gas by failing to secure a long-term gas dedication to the Nemaha Pipeline, and second, to add an amendment to reflect the alleged alter ego status between Slawson and Alameda. Defendants opposed this motion, contending that adding these new claims at this late stage in the proceedings would be highly prejudicial, disruptive, and futile.

The district court denied Strategic's request to amend the pretrial order on these grounds. As for Strategic's first request, the district court found the amendment was:  (1) futile without an expert, (2) prejudicial to Defendants, and (3) untimely and time barred. The district court also denied Strategic's request to add an alter ego claim against Slawson because:  "Defendants will either be deprived of any opportunity to conduct discovery and defend themselves against this claim or have to reopen discovery after the pretrial order and dispositive motion deadline has passed, adding further delay and expense to this already five-year-old litigation." Strategic asserts several reasons why it believes the district court erred in denying its request.

A. *Standard of review*

This court reviews a denial of a motion to amend a final pretrial order for an abuse of discretion. See *Norton Farms, Inc. v. Anadarko Petroleum Corp.*, 32 Kan. App. 2d 899, 904, 91 P.3d 1239 (2004). In exercising its discretion, the district court should have

23

"proper regard for what is just and fair under the existing circumstances, and [should] not act in an arbitrary fashion or unreasonable manner." 32 Kan. App. 2d at 902. An abuse of discretion will only be found where no reasonable person would agree with the decision or if it is based on an error of fact or law. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

B. *Since Strategic sought to amend a final pretrial order, K.S.A. 2023 Supp. 60-216 applies.*

A final pretrial order "controls the subsequent course of the action unless the court modifies it." K.S.A. 2023 Supp. 60-216(d). A "court may modify the order issued after a final pretrial conference only to prevent manifest injustice." K.S.A. 2023 Supp. 60-216(e). The party requesting the amendment must show manifest injustice at the time of the motion. *Herrell v. Maddux*, 217 Kan. 192, 195, 535 P.2d 935 (1975). Unlike K.S.A. 2023 Supp. 60-216(e)'s manifest injustice standard, K.S.A. 2023 Supp. 60-215 permits a party to amend its pleadings with leave of the district court and specifies district courts "should freely give leave when justice so requires." K.S.A. 2023 Supp. 60-215(a)(2).

The district court determined Strategic's motion was governed by K.S.A. 2021 Supp. 60-216. But Strategic argues the district court should have applied the more lenient K.S.A. 2021 Supp. 60-215 standard because it contends the pretrial order was not "final" as used in K.S.A. 2021 Supp. 60-216. K.S.A. 60-216 "distinguishes between pretrial conferences and *final* pretrial conferences." *Gates v. Goodyear*, 37 Kan. App. 2d 623, 630, 155 P.3d 1196 (2007).

Strategic contends the pretrial order was not final because it "was not the result of a 'final' pretrial conference." The gist of Strategic's argument is that there was "ample time" between the pretrial order entered by the district court on November 21, 2021, and the start of trial in June 2022 for "any final pretrial conference and the completion of any

24

remaining pretrial work." But Strategic's argument is belied by the language of the pretrial order. Although there were several months between the pretrial conference and trial, the pretrial order laid out deadlines for pretrial filings in an orderly fashion which filled those months. And the pretrial order included no deadlines for an additional pretrial conference. The pretrial order also contained all information parties would normally include in a final pretrial order and the order noted that it "supersed[ed] all pleadings and shall control the trial of this matter," providing further evidence that it was a "final" pretrial order governed by K.S.A. 2021 Supp. 60-216. Strategic's reliance on simply the passage of time between the entry of the pretrial order and the trial date cannot overcome the language of the order itself.

C. *The district court did not err in finding Strategic did not demonstrate manifest injustice would result if it were not allowed to amend the pretrial order.*

A district court should only modify a final pretrial order to prevent manifest injustice. K.S.A. 2023 Supp. 60-216. Like Defendants, we have discovered no Kansas state court decisions detailing the manifest injustice standard as it applies to motions to amend a pretrial order. Below, the district court centered its analysis on *Koch v. Koch Indus., Inc.*, 203 F.3d 1202 (10th Cir. 2000). We agree that *Koch* appears to set forth an appropriate measuring tool for viewing motions filed under K.S.A. 60-216.

In *Koch*, "when faced with a challenge to a district court's exclusion of an issue by failing to amend a pretrial order," the Tenth Circuit Court of Appeals stated it applies a four-factor test. 203 F.3d at 1222-23. These factors are: "(1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue; and (4) bad faith by the party seeking to modify the order." 203 F.3d at 1222. *Koch* also requires the party moving for final pretrial order modification to bear the burden of demonstrating modification is necessary to prevent manifest injustice. 203 F.3d at 1222.

25

Generally, manifest injustice "exists if something is 'obviously unfair or shocking to the conscience.'" *State v. Jackson*, 52 Kan. App. 2d 125, 131-32, 363 P.3d 408 (2015).

The district court appeared to focus on the prejudice to Defendants and disruption of the trial in denying Strategic's motion, along with finding the proposed amendments would be futile. Strategic has not persuaded us that the court abused its discretion in making these findings. First, while Strategic does not address when it discovered facts prompting it to seek to add an alter ego claim, it says it did not discover the basis for the other amendments it sought until discovery that was conducted between August 2021 and November 30, 2021. Yet it addresses none of the district court's findings explaining several occasions or filings which show that Strategic had the necessary information to recognize all the new or amended claims it sought to add well before the pretrial order was entered—including the alter ego claim. While Strategic recites additional *evidence* it discovered in that late 2021 time frame, which Defendants relied on to support their position on the existence and enforceability of a gas dedication, it fails to acknowledge or address the court's finding that it was aware of Defendants' *position* on the issue well before the pretrial conference. Nor does it address the court's finding that it "had all of the facts needed to initiate this alter ego claim long before the parties submitted the final Pretrial Order on November 15, 2021."

Next, Strategic fails to overcome the district court's finding that its "11th hour" amendment would prejudice Defendants by denying them the opportunity to conduct discovery on the new and amended claims. While Strategic argues Defendants did not "identify[] specific examples of documents or areas of inquiry Defendants would have pursued related to Strategic's proposed amendment," this assertion is not supported by the record. The district court recited discovery efforts Defendants said they would have pursued had they known about Strategic's new and amended claims. The court pointed out the lines of questioning Defendants specified "would go to credibility of the [new and amended] claim, including whether [Strategic] took actions to mitigate any damages it

26

claims to have suffered." We fail to see how the district court abused its discretion in finding Defendants would have been prejudiced by the amendment.

Last, the district court found the amendments would be "highly disruptive" to the trial. Strategic sought to amend over a dozen claims under its new alternate theory that Slawson failed to discharge its duties as the pipeline operator by failing to secure a long-term dedication of gas to the pipeline. This was a significant shift around six months before trial, and as the district court noted, after "five years of litigation and after the close of all discovery, which involved the production of hundreds of thousands of pages of documents and over 20 depositions." We do not see that the court abused its discretion to deny Strategic's "invitation to up-end five years of litigation for adoption of a conflicting theory—a claim it could have brought from the beginning."

While no one claims Strategic engaged in bad faith in seeking to modify the pretrial order, evidence of this factor is not required. Strategic has failed to demonstrate manifest injustice would result without the amendments based on the other three *Koch* factors because (1) the amendments would prejudice Defendants, (2) Defendants were unable to cure this prejudice since discovery had closed, and (3) the late-stage amendments would disrupt the orderly and efficient trial of the case. Since we agree the district court did not abuse its discretion in denying the motion to amend for these reasons, we need not address the district court's additional reason for denying the motion: that Strategic's failure to identify an expert to support its new and amended claims rendered its amendments futile.

## CONCLUSION

For the reasons explained above, our decision to affirm the denial of Strategic's motion to amend the pretrial order and affirm the decision to grant summary judgment to

Defendants on damages renders the rest of the parties' claims on appeal—including the cross-appeal—moot.

Affirmed.